[File No. 6691.]

CLIFTON L. VOSS, Individually and Doing Business as Voss Studio, Respondent, v. JOHN GRAY, as Tax Commissioner of the State of North Dakota, Appellant.

(298 N. W. 1.)

728

Opinion filed May 2, 1941.

*Alvin C. Strutz,* Attorney General, *C. E. Brace,* Assistant Attorney General, and *T. A. Thompson,* for appellant.

*Clair F. Brickner,* for respondent.

NUESSLE, J. The plaintiff is a photographer, licensed pursuant to the provisions of chapter 188, Session Laws 1939. He carries on his business in the city of Fargo. He held a sales permit issued by the state tax commissioner but refused to collect and pay sales tax upon photographs made by himself for patrons who sat for photographs to be made on their order.

The tax commissioner ruled that when these photographs were thus made and delivered there was a sale of tangible personal property within the meaning of the Sales Tax Act, chapter 249, Session Laws 1937. Accordingly, upon the plaintiff's failure to collect and pay the tax pursuant to the statute, the tax commissioner notified him to appear and show cause why his sales tax permit should not be revoked and why he should not pay the tax assessed. The plaintiff protested and demanded a hearing. A hearing was had and the commissioner then made his order, denying plaintiff's protest and affirming the assessment. Thereupon the plaintiff, pursuant to § 13 of the Sales Tax Act, perfected an appeal to the district court. Testimony was taken on the issues made, the cause was submitted, and the court found for the plaintiff and ordered judgment accordingly. Judgment was entered and the tax commissioner perfected the instant appeal.

The Sales Tax Act, chapter 249, Session Laws 1937, provides:

"Sec. 1. (b) 'Sale' means any transfer, exchange, or barter, conditional or otherwise, in any manner or by any means whatsoever, for a consideration.

"(c) 'Retail Sale' or 'Sale at Retail' means the sale to a consumer or to any person for any purpose, other than for processing or for resale, of tangible personal property and the sale of steam, gas, electricity, water, and communication service to retail consumers or users, and shall include the ordering, selecting or aiding a customer to select any goods, wares, or merchandise from any price list, or catalogue, which said customer might order, or be ordered for such customer to be shipped directly to such customer. By the term 'processing' as used in this act is meant tangible personal property that is used in manufacturing, producing or processing and which becomes an ingredient or component part of other tangible personal property and which latter tangible personal property becomes subject to the retail sales tax. The sale of an item of tangible personal property for the purpose of incorporating it in or attaching it to other real or personal property otherwise exempt from the sales tax shall for the purposes of this act be considered as a sale of tangible personal property for a purpose other than for processing.

"(d) 'Business' includes any activity engaged in by any person or caused to be engaged in by him with the object of gain, benefit, or advantage, either direct or indirect.

"(e) 'Retailer' includes every person engaged in the business of selling tangible goods, wares, or merchandise at retail. . . .

"Section 2. There is hereby imposed . . . a tax of two per cent (2%) upon the gross receipts from all sales of tangible personal property, consisting of goods, wares or merchandise except as otherwise provided in this act, sold at retail in the state of North Dakota to consumers or users; . . .

"Section 3. There are hereby specifically exempted from the provisions of this Act and from computation of the amount of tax imposed by it, the following:

"(a) The gross receipts from sales of tangible personal property which this State is prohibited from taxing under the Constitution or laws of the United States or under the Constitution of this state.

"(b) The gross receipts from the sales, furnishing or service of transportation service.

"(c) The gross receipts from sales of tangible personal property used for the performance of a contract on public works executed prior to May 1st, 1935.

"(d) The gross receipts from sales of tickets or admissions to state, county, district and local fairs, and the gross receipts from educational, religious, or charitable activities where the entire amount of such receipts is expended for educational, religious, or charitable purposes.

"(e) The gross receipts from the sale by any school board of this State of books and school supplies to regularly enrolled students at cost."

Without further reciting the provisions of the act it is enough now to say that the tax thus imposed is a tax on the consumer. Jewel Tea Co. v. State Tax Comr. ante, 229, 293 N. W. 386.

The tax commissioner contends that when photographs are made and delivered to order for a money consideration, the transaction results in a sale of tangible personal property and accordingly the tax prescribed in § 2 of the act, quoted above, must be paid to the photographer by the person whose photograph is thus taken and, by the former, accounted for to the state. On the other hand, the respondent insists that there is no sale of tangible personal property; that the contract is, in fact, a contract for personal service; that the property in the photographs, the product of the transaction, is at all times in the person whose photograph is taken, and so no tax is payable.

The plaintiff testified as to the manner of the carrying on of his business, as to the cost of the material used—cards, paper, chemicals etc., and as to the manner in which he makes his charges. His testimony is that the cost of the various materials used amounts to only from $1\frac{1}{2}$ to $2\frac{1}{2}$ per cent of the charge that is made for the finished photograph, paid by the person procuring it. The remainder of his charge is made for his services in the use of the requisite appliances and in the retouching and finishing of the negatives from which the likenesses are reproduced. He makes no charge for the folders provided to protect the photographs, though the cost of these is much greater than that of the paper and chemicals used in making the photographs. Nor does it appear that any charge is made for the studio

and its appurtenances, or for the camera and other appliances. Plaintiff's testimony is that it is his practice when a customer appears and desires to have his photograph taken, to give the customer a sitting at which several exposures are taken. He advises the customer that there is a fixed charge for this service. Proofs are then made from the negatives which are developed and the customer indicates whether he desires photographs finished from these or any of them. If he does, a further charge is made for the photographs thus finished. Accordingly, there are two charges made. One for the sitting, and if the proofs developed are satisfactory, a further charge for the finished photograph.

Though the plaintiff testified at length touching the above matters, the record is silent as to what becomes of the negatives—whether he retains them or turns them over to his customers with the finished photographs. These negatives are the essential objects in the process of making the photographs. On them is expended the greater part of the service required of the photographer. To perfect them it is necessary that he possess and exercise artistic skill and technique. When perfected a great number of reproductions may be made from each negative.

Plaintiff's chief contention is that under the plan and system in effect in carrying on his business he never at any time has any property in the finished photographs which he delivers to his customers. Accordingly he contends that there is no sale within the definition of sale contained in the statute and that any consideration he may receive is in return for his services and the exercise in the performance of those services of his artistic ability and skill.

We are, however, unable to agree with these contentions. When an individual desiring photographs goes to a studio and arranges to have his likeness taken and reproduced, the ultimate result of the transaction is the sale of the photographs. Until they are delivered or paid for they belong to the photographer. The relation between the photographer and his customer, who contracts to have his photograph taken and finished is a confidential one and there is implied in the contract of employment an agreement that no photographs thus taken and finished may be sold or delivered for any purpose to any other person than the one who makes the contract without the latter's consent. See Moore v. Rugg, 44 Minn. 28, 46 N. W. 141, 9 L.R.A. 58, 20 Am. St. Rep.

539; Corliss v. E. W. Walker Co. (C. C.) 57 F. 434, 64 F. 280, 31 L.R.A. 283; Pollard v. Photographic Co. L. R. 40 Ch. Div. (Eng.) 345; Melville v. "Mirror of Life" Co. [1895] 2 Ch. 531; Murray v. Heath, 1 Barn. & Ad. 804, 109 Eng. Reprint, 985. We need not here determine to whom in the ordinary case the negative belongs after the photographs contracted for are delivered and paid for—whether it belongs to the photographer, or the one who contracted for the finished photographs. But see Corliss v. E. W. Walker Co. (C. C.) 57 F. 434, 64 F. 280, 31 L.R.A. 283, supra. The case of Pollard v. Photographic Co. L. R. 40 Ch. Div. 345, supra, is cited as an authority in Moore v. Rugg, 44 Minn. 28, 46 N. W. 141, 9 L.R.A. 58, 20 Am. St. Rep. 539, supra, and in numerous of the other cases touching the questions as to the rights and obligations of a photographer. And the Pollard Case in turn is predicated largely on the case of Murray v. Heath, 1 Barn. & Ad. 804, 109 Eng. Reprint 985, supra. In Murray v. Heath, Murray employed Heath to engrave plates from drawings belonging to the former. Heath took off from the plates so engraved a number of proof impressions which he retained for his own use. Afterwards he became bankrupt and his assignees attempted to sell the prints. Murray sued in trover to recover them. The court held that the action could not be maintained unless the prints were the property of Murray; that they were the property of Heath since the plates were the property of Heath they not having been delivered to or accepted by Murray, though Heath might be liable to an action for breach of contract in making the prints and not delivering them over.

There is no question but that a successful photographer must, in the carrying on of his business, possess and exercise artistic talent and skill. But the fact that he does is not the determining factor. Through the employment of that talent and skill photographic likenesses are produced and, when produced, are tangible property. Until they are delivered or paid for they are no more the property of the person who contracts for them than is the suit of clothes made to order by his tailor the property of the customer who orders and is measured for it until it is delivered or paid for; or than is the bookcase, designed and made for the householder by the cabinet-maker, the property of the former until it is delivered or paid for. And innumerable other parallel instances might be cited. In all of such cases there is a con-

tract for the employment of the skill and ability of the maker of the articles contracted for. The product resulting is tangible personal property but it remains the property of the maker until it is paid for or delivered to the person for whom it is made. There is no article, fabricated by a machine or fashioned by the human hand, that is not the fruit of the exercise and application of individual ability and skill. And few, indeed, are the instances where the greater part of the cost thereof is not chargeable to personal service directly or remotely applied. The fact that an article is made to order and is of particular value to one individual and of little or no value to anyone else, does not bring about the legal result that the property in it is at all times in him who contracts to have it made and never at any time in the maker. Nor can we discover any reason why the peculiar confidential relation that exists between the photographer and his customer should be held to bring about such a result.

Plaintiff also urges that when the Sales Tax Act, supra, was first enacted in 1935, the tax commissioner who was charged with its enforcement, ruled that no tax charge should be made on account of the sale of photographs; that this ruling was in effect in 1937 when the Sales Tax Act was re-enacted; that the legislature is presumed to have known of the ruling and accordingly the act was re-enacted with that ruling in mind. So plaintiff contends it must be held that this construction of the 1935 Act was adopted by the re-enactment of the Act in 1937.

It is true that in construing a statute of doubtful meaning a court will give weight to the practical construction placed thereon by the officers charged with the duty of executing and applying the statute, especially where the construction has been in effect for a considerable time and acquiesced in by those affected by it. State v. Equitable Life Assur. Soc. 68 N. D. 641, 282 N. W. 411. And it is likewise true that the legislature is presumed to know the construction of its statutes by the executive departments of the state. John Hancock Mut. L. Ins. Co. v. Lookingbill, 218 Iowa 373, 253 N. W. 604. And where a statute which has been given a particular practical construction by the officers charged with its application and enforcement is re-enacted, this fact is pertinent in determining the legislative intent, and the presumption is that the legislative intent was that the re-enacted statute

should be thus construed. But this is, after all, only a presumption and may be overborne when all the circumstances in connection with the matter are taken into consideration. In the instant case it appears that when the Sales Tax Act was first put into effect in 1935, the tax commissioner's office did rule that no sales tax should be charged and collected by photographers for photographs made and sold. The Sales Tax Act, chapter 276, Session Laws 1935, imposed the tax only for the period "beginning the first day of May, 1935 and ending May 1, 1937." In 1937 this act was re-enacted with but slight changes and the tax was reimposed for the period "beginning the first day of May, 1937 and ending June 30, 1939." Immediately after its re-enactment the tax commissioner amended his prior ruling as to the effect of the tax with respect to photographers, and ruled that they should collect a charge in the amount of the tax on photographs made and delivered to their customers for a consideration by them. This ruling has continued in effect since that time. While it was so in effect in 1939, the legislative assembly again re-enacted the Sales Tax Act without change and provided that the tax should be imposed for the period "beginning the first day of July, 1939, and ending June 30, 1941." And again in 1941 the tax was reimposed for the period "beginning the first day of July, 1941, and ending June 30, 1943." We think that under these circumstances it cannot be said that the legislative intention was that no tax should be charged on account of the sale of photographs to their customers by photographers.

The Sales Tax Act contemplates that whenever a sale at retail of tangible personal property not specifically exempted is made, the prescribed tax shall be paid. Photographers carrying on enterprises, as was the plaintiff, are engaged in business. Photographs are tangible personal property. They are transferred and title to them passes for a consideration. Thus sales are made. They are not procured for processing or resale. Such sales are not within the statutory exemptions. Accordingly they are subject to the tax. As supporting our conclusions, see Bigsby v. Johnson, — Cal. (2d) —, 99 P. (2d) 268, and cases cited therein; Kamp v. Johnson, 15 Cal. (2d) 187, 99 P. (2d) 274; Cusick v. Com. 260 Ky. 204, 84 S. W. (2d) 14 (a case almost identical with the instant case). It is true that some courts have held contrary to the views expressed above. We believe, how-

ever, that the construction we have given it is wholly consistent with the purpose as well as with the general practical application of the Sales Tax Act and in line with the departmental construction adopted in a considerable majority of the jurisdictions having statutes identical with or similar to the act here under consideration.

We have referred to the testimony of the plaintiff as to the practice followed by him in the making of charges for the taking and finishing of photographs. He makes two charges, one for the sitting, which must be paid whether the photographs are finished and delivered or not, and a further charge if and when the photographs are finished and delivered to the customer. Where, as in the instant case, such a practice is followed in good faith and not for the purpose of evading the tax, we are of the opinion that the tax is not collectible on account of the charge for the sitting, but it should be imposed and collected on account of the charge made for the finished photographs.

The judgment of the district court is reversed and the case is remanded for further proceedings in accordance with this opinion.

BURR, Ch. J., and BURKE and MORRIS, JJ., concur.

CHRISTIANSON, J. (dissenting). I am unable to agree with the opinion prepared by Judge Nuessle. The Sales Tax Act of this state imposes a tax upon the purchaser or consumer, and makes it the duty of the seller to add the amount of the tax to the sales price or charge and to collect and remit the tax to the tax commissioner. Jewel Tea Co. v. State Tax Comr. ante, 229, 293 N. W. 386. The retailer may not assume or pay the tax, but is required to add the tax or its equivalent to the sales price or charge, and the tax so added constitutes a part of the price or charge. It is unlawful for the retailer to pay the tax or to hold out or state directly or indirectly that he will absorb the tax or any part thereof, or make a refund of any part of the tax. Laws 1937, chap. 249, §§ 6 and 7. The Sales Tax Act imposes "a tax of two per cent (2%) upon the gross receipts from all sales of tangible personal property, consisting of goods, wares or merchandise . . . sold at retail in the state of North Dakota to consumers or users." Id. § 2. The act defines the terms "sale," "retail sale," "business," and "retailer" as follows:

" 'Sale' means any transfer, exchange, or barter, conditional or otherwise, in any manner or by any means whatsoever, for a consideration."

" 'Retail Sale' or 'Sale at Retail' means the sale to a consumer or to any person for any purpose, other than for processing or for resale, of tangible personal property. . . ."

" 'Retailer' includes every person engaged in the business of selling tangible goods, wares, or merchandise at retail. . . ." Id. § 1.

The act makes it unlawful "for any person to engage in or transact business as a retailer within the state, unless a permit or permits shall have been issued to him" as prescribed in the act. Id. § 11.

The plaintiff is engaged in business in the city of Fargo, and has been so engaged for more than six and one-half years. His business is of two types: (1) He is a professional photographer and operates a studio where he takes photographs of persons who call and desire to have their photographs taken and made; and, (2) he also sells photographic supplies, such as cameras, films, and frames. It is conceded that the latter type of business falls within the purview of the Sales Tax Act, and that the sales of photographic supplies are subject to the sales tax. Accordingly, the plaintiff applied for, and received, a permit as a retailer and it is admitted that he has paid all taxes upon sales of photographic supplies, but he has refused to collect and pay a sales tax upon photographs which he has taken of, and made for, persons who sat for photographs to be made on their order.

In September 1939 the state tax commissioner levied an assessment against the plaintiff Voss for sales tax on photographs he had made to order for persons who sat for photographs from July 1, 1937, to April 1, 1939. Voss objected to the assessment and demanded a hearing. After hearing, the state tax commissioner confirmed the assessment and Voss appealed to the district court from the assessment as thus made and confirmed. On the hearing in the district court witnesses were sworn and testified. There is no substantial dispute in the evidence, and the trial court found the facts to be:

"That the plaintiff, Voss, in making a portrait uses his own camera, lens and background. He makes a negative on cellulose plates having a chemical coating. . . . He develops them and shows the proof to his customer. This operation is called a 'sitting.' When the 'sitter'

asks what the cost will be for making a picture, the plaintiff divides the cost into two operations. He tells the customer he must first pay him a certain definite amount for making a sitting, and he must also pay a certain definite amount for the photographs themselves, for the development of the pictures. The sitting consists of showing the customer the proofs. That is the first operation. This is done for the purpose of finding out whether the customer really wants the photographs. He takes several negatives and shows several proofs, to learn the particular wishes of the particular customer. . . . If the customer orders photographs made after the proofs are shown him, the next step he takes is to do a great deal of work on the negatives, by way of retouching and etching. Retouching is adding to the surface of the negative and filling it in. Etching is taking away, the opposite of retouching. This requires a great deal of skill and years of learning to become adept. He may intensify one portion of a negative and may reduce another portion of it. After the negative has been produced to his satisfaction, he creates a photograph of the customer on a blank sheet of sensitized paper, with the aid of bits of chemicals. . . .

"To make an artistic photograph, skill is required in manipulating the camera, lens and light. The plaintiff makes no additional charge for folders. He gives the folders to his customers to protect his work or art. He sells some merchandise in his business, such as frames, films, and other kinds of merchandise, and on such sales he collects and remits the sales tax to the Sales Tax Department, and has done so for the years 1936, 1937, 1938, and 1939, and is willing to continue to do so. He does not claim title to and does not have title to the photographs after he has made them. . . . He never sells a photograph of his customers. . . .

"Aside from the description of the artistic work and the artistic nature of the work performed by the plaintiff in making a portrait of his sitter, the facts to be borne in mind in disposing of this case are that the sitter comes to the photographer and requests him to make his photograph."

The trial court found as a conclusion of law that the tax levied by the state tax commissioner on September 5th, 1939, "is illegal and not enforceable, and that the plaintiff did not sell any goods, wares and

merchandise within the contemplation of the act in question to the persons whose photographs he took; that the relationship between the plaintiff and the persons whose photographs he took was that of an artist, and the thing that he sold was his services and his artistic ability; that the plaintiff never had any title to the negative or any of the pictures taken and developed from them, but the title to said pictures and the negatives was at all times in the person whose picture was taken, and such person alone had the power of disposition of the same and the exclusive control over them."

The question presented for determination on this appeal is one of statutory construction. Did the legislature intend that where a person arranges to sit for a photograph and to have the photographer make a photograph from such proof as shall be chosen by the sitter, that the sitter must pay a "sales tax" upon the consideration that is paid to the photographer for the entire transaction resulting in the delivery of a photograph? Is the transaction between the photographer and a person who arranges with the photographer to sit for, and have a photograph made to his order one of sale "of tangible personal property consisting of goods, wares and merchandise?" The trial court answered these questions in the negative, and in my opinion that was the correct answer.

This state first enacted a sales tax law in 1933. Laws 1933, chap. 261. That law imposed a tax not only "upon the sales of tangible personal property" but also "upon sales of professional services." Id. § 3. That law was not restricted to "sales of tangible personal property, *consisting of goods, wares or merchandise,*" it applied to "sales of tangible personal property," even though such property might not consist of "goods, wares or merchandise." That law enumerated a large number of businesses and professions as being subject to the tax. Photographers were among those so enumerated, and so were abstractors, architects, dentists, doctors and lawyers. Id. Schedule I. This law never became effective. It was referred pursuant to referendum petition and was disapproved by the people at the election by a vote of more than two to one. Laws 1935, p. 502.

In 1935 the Legislative Assembly enacted another sales tax measure which, so far as material here, is identical with the law in question in this proceeding. Laws 1935, chap. 276. That law did not impose

a tax upon "sales of professional services" but provided: "There is hereby imposed, beginning the first day of May, 1935, and ending May 1, 1937, a tax of two per cent (2%) upon the gross receipts from all sales of tangible personal property, consisting of goods, wares or merchandise . . . sold at retail in the state of North Dakota to consumers or users." Id. § 2.

The Sales Tax Act of 1935 took effect as a law on its passage and approval on March 11th, 1935 (Laws 1935, p. 411), and became operative as a tax measure on May 1st, 1935. Id. § 2.

The 1935 Sales Tax Act was also referred, but was approved by the people at a referendum election held July 15, 1935. Laws 1937, p. 516. The state tax commissioner was "charged with the administration" of the act, "and the taxes imposed thereby;" and was authorized to "prescribe all rules and regulations not inconsistent with the provisions" of the act "necessary and advisable for its detailed administration and to effectuate its purposes." Id. § 16. As the act provided for a new system of taxation in this state, it was only natural that questions of construction and administration should arise at the very outset. The lawmakers recognized that administrative problems and questions would arise. Thus, while the act provided that retailers should, as far as practicable, add the tax or the average equivalent thereof to the sales price, and that the tax when so added should constitute a part of the purchase price and be a debt from consumer or user to the retailer, recoverable at law in the same manner as other debts, and that it should be unlawful for any retailer to advertise or hold out or state to the public or any consumer, directly or indirectly, that the tax, or any part thereof, would be absorbed by the retailer, or that it would not be considered as an element in the price to the consumer, or if added that it would be refunded (id. §§ 6 and 7); it further provided:

"Agreements between competing retailers, or the adoption of appropriate rules and regulations by organizations or associations of retailers to provide uniform methods for adding such tax or the average equivalent thereof, and which do not involve price-fixing agreements otherwise unlawful, and which shall first have the approval of the Commissioner, are expressly authorized and shall be held not to be in violation of any anti-trust laws of this state." (Id. § 6.)

Acting under this provision, the North Dakota Retail Dealers Association, at a meeting held in Bismarck on March 19, 1935, approved a plan for the adding of the sales tax to, and the collecting of the same as a part of, the sales price as follows: That no tax be added where the sales price is less than 15¢; that on sales from 15¢ to 65¢, 1 cent be added for sales tax; that on sales from 66¢ to $1.24, 2 cents be added; and that where the sales price consists of larger amounts, amounts in similar proportions be added for sales tax. The tax commissioner approved this plan and schedule (N. D. 1937 Sales Tax Act and Rules and Regulations, p. 25), and it has remained in force since its approval in 1935.

After the Sales Tax Act of 1935 had been enacted, questions arose as to what transactions were or were not within the act so as to render the amount paid "a receipt from a sale of tangible personal property, consisting of goods, wares or merchandise sold at retail to a consumer or user within the state;" and business, trade and professional associations and organizations sought to ascertain to what extent the activities of their members would be affected by the sales tax. The photographers were no exception, and, according to the evidence in this proceeding, a conference was had between representatives of the North Dakota Photographers' Association and the Director of the Sales Tax Division. On July 19, 1935 (four days after the act had been approved at the Referendum Election), he addressed the following communication to the then president of the North Dakota Photographers' Association:

"From reading your letter of July 17, it would be our conclusion that you are correct in not charging the sales tax on the portraits made and delivered for customers. Also there would be no sales tax to be collected on kodak finishing, as in both instances this would be considered a service.

"It might be well to inform your association members more clearly on this point."

The 1935 Sales Tax Act was administered in conformity with this ruling throughout its existence. In 1937 the Legislative Assembly enacted another sales tax measure which, so far as is material here, was identical with the Act of 1935. Laws 1937, chap. 249. That act became effective on the expiration of the Act of 1935, namely, on May.

1st, 1937. That act, too, was limited in its operation to a two-year period. Id. § 2. In 1939 the legislature enacted a measure to continue the 1937 Act in force for an additional period of two years upon the expiration of the former act. Laws 1939, chap. 234. This act left wholly unchanged the provisions in question here. They remained as they were enacted in the Act of 1935 and as they had been re-enacted in the Act of 1937.

The 1939 Legislative Assembly, also, enacted a law giving a professional standing to photographers. Laws 1939, chap. 188. This law created a state board of photographic examiners, and provides "for licensing and registration of persons engaged in the practice of professional photography." Section 1 of the law reads:

"The practice of professional photography shall be deemed to be the profession or occupation of production for compensation of images on sensitized. materials by the action of light, and with the use of a camera; development and fixation of the latent image to render same visible and permanent, and/or the subsequent reproduction or transfer of such image, either negative or positive, upon other sensitized material by the aid of light and chemical action. This shall not be deemed to include photo finishing, motion picture photography, the intaglio printing processes, nor the processes known as blue printing, brown printing and photoengraving, nor the use of the photostat or equivalent apparatus." The law provides for the examination and licensing of photographers, the payment of an examination fee, and an annual license fee (id. §§ 8, 11), and makes it a misdemeanor to "engage or attempt to engage in the practice of professional photography" in this state, without first having complied with, and obtained the prescribed license, under the provisions thereof. Id. §§ 13 and 14. This law became effective July 1st, 1939, and has since remained in full force and effect.

As has been noted, the Sales Tax Act of 1933 imposed a tax not only upon sales of tangible personal property, but imposed a *sales tax* as well upon "sales of professional services." Laws 1933, chap. 261, § 3. Under that act the gross receipts of photographers from all activities were subject to the tax. In fact, the act imposed a tax upon the gross receipts of practically every conceivable activity, including abstractors, architects, auctioneers, barbers, public accountants, dentists,

doctors, and lawyers.  Id.  Schedule I.  While that act never became effective (having been disapproved at a Referendum Election), nevertheless the members of the Legislative Assembly that convened in January 1935, were wholly familiar with the provisions of the Act of 1933.  In fact, many of those who served in the Legislative Assembly of 1933 were also members of the Assembly in 1935.  In the Act of 1935 the lawmakers deliberately abstained from imposing a tax upon professional services; and provided that the tax should be imposed only "upon the gross receipts from all sales of tangible personal property, consisting of goods, wares or merchandise  .  .  .  sold at retail  .  .  .  to consumers or users" within this state.  If the members of the 1935 Legislative Assembly in the course of enactment of the 1935 Sales Tax Act, consulted legal treatises and the decisions of the courts of other jurisdictions for the purpose of ascertaining whether a transaction between a photographer who is employed to make a negative and photograph for another is one of sale of "goods, wares or merchandise" or a contract for the performance of service, they could hardly have escaped the conclusion that under the authorities the transaction did not result in a contract for the sale of "goods, wares, or merchandise," but resulted in a contract of "confidential employment."  Pollard v. Photographic Co. L. R. 40 Ch. Div. (Eng.) 345; White Studio v. Dreyfoos, 156 App. Div. 762, 142 N. Y. S. 37; Beck & P. Lithographing Co. v. Colorado Mill. & Elevator Co. (C. C. A. 8th) 52 F. 700; J. A. Burgess Co. v. Ames, 359 Ill. 427, 194 N. E. 565; note: 15 Cornell L. Quart. 103; Lumiere v. Robertson-Cole Distributing Corp. (C. C. A. 2d) 280 F. 550, 24 A.L.R. 1317, and annotation at p. 1320.  They would have found, also, that the authorities were practically all agreed that in absence of specific agreement to the contrary "a photographer who is employed to make a negative and photographs for another, in the usual course of the former's business, has no right to use the negatives for his own purposes" (annotation in 24 A.L.R. p. 1320); that "in the absence of a stipulation to the contrary, the ordinary bargain between a photographer and his customer includes, by implication, an agreement that the latter shall control the disposition of the prints from the negative for which he sits, even though the ownership of the negative may be in the photographer" (22 Am. & Eng. Enc. Law, 2d ed. 776); and that some of the "cases have asserted the additional grounds of viola-

tion of confidence, right of property" (annotation in 24 A.L.R. 1320) and right of privacy. Annotation in 50 L.R.A. 397; Klug v. Sheriffs, 129 Wis. 468, 471–474, 109 N. W. 656–658, 7 L.R.A.(N.S.) 362, 116 Am. St. Rep. 967, 9 Ann. Cas. 1013; 21 R. C. L. p. 1199, § 4; note: 15 Cornell L. Quart. pp. 103 et seq.

So far as the arguments and briefs submitted and the research made by the members of this court in this case disclose, the members of the legislature would have found only one decision in the reports of the adjudicated cases in this country involving an attempt to impose a retail sales tax upon the consideration paid to a photographer, namely, the decision of the supreme court of Illinois in J. A. Burgess Co. v. Ames, 359 Ill. 427, 194 N. E. 565, supra, wherein the court held that a "commercial photographer who produced photographs for advertising and commercial purposes with his own property and models and retained title to picture and gave to advertiser only the right to reproduce photograph is not engaged in business of 'selling tangible personal property at retail.' "

Statutes levying taxes "are not to be extended by implication beyond the clear import of the language used. If the words are doubtful, the doubt must be resolved against the government and in favor of the taxpayer." United States v. Merriam, 263 U. S. 179, 68 L. ed. 240, 44 S. Ct. 69, 29 A.L.R. 1547; Gould v. Gould, 245 U. S. 151, 62 L. ed. 211, 38 S. Ct. 53; Goldberg v. Gray, ante, 663, 297 N. W. 124.

As has been pointed out, immediately after the 1935 Sales Tax Act became effective, the executive officer charged with the duty of administering that act, and who, by the act, was vested with authority to prescribe "rules and regulations, not inconsistent with the provisions of the act, necessary and advisable for its detailed administration," in performing his prescribed duties, determined that transactions between a photographer and his patrons, like the ones in question here, do not constitute sales of tangible personal property, consisting of goods, wares or merchandise, and are not subject to the tax imposed by the act. That construction prevailed during the entire time the 1935 Sales Tax Act was in effect, and the correctness of such construction was never questioned. In 1937 the legislature re-enacted, without change, the provisions of the 1935 Act which had been so construed. The Legislative Assembly that convened in 1939 made no change in

such provisions. The plaintiff was operating his studio when the 1935 Sales Tax Act became effective, and has continued to do so. In his dealings with patrons he has conformed to the ruling of the tax commissioner communicated to the photographers in 1935. The record does not disclose when the ruling was changed, but it does disclose that the change was made by a successor of the tax commissioner who was in office in 1935. The record does not disclose that plaintiff was notified of the change of ruling, but it does show that no assessment was made against plaintiff for such sales tax until on September 5, 1939, and that he was given notice thereof. The record also shows that the plaintiff, during the entire period covered by the assessment, operated in accordance with the ruling made in 1935:—He did not charge or add a sales tax to the compensation paid to him by persons who sat for and had photographs made to their order; and he did not pay to the tax commissioner such tax or the equivalent thereof; but he collected sales tax upon articles of merchandise which he sold to others, such as frames, films, and cameras, and photographs of public characters and events taken by the plaintiff at his own instance, and he has fully accounted for and paid such taxes to the tax commissioner.

It is a maxim of jurisprudence that "contemporaneous exposition is in general the best." Comp. Laws 1913, § 7269. *"Contemporanea expositio est optima et fortissima in lege.* A contemporaneous exposition is the best and most powerful in the law. Coke, 2d Inst. 11; 3 Coke, 7." Cyclopedic Law Dictionary.

The Supreme Court of the United States has applied the rule of contemporaneous and practical construction in determining questions as to the authority of its members and the jurisdiction of the court. Stuart v. Laird, 1 Cranch (U. S.) 299, 2 L. ed. 115; Martin v. Hunter, 1 Wheat. (U. S.) 304, 351, 4 L. ed. 97, 109; Cohen v. Virginia, 6 Wheat. (U. S.) 264, 418, 5 L. ed. 257, 294.

The contemporaneous construction placed upon a statute by the highest officers in the executive department of the government charged with the duty of administering it is entitled to weight, and "should not be disregarded or overturned except for the most cogent reasons, and unless clearly erroneous." 59 C. J. 1025 et seq.; 25 R. C. L. p. 1043; 26 Am. & Eng. Enc. Law 2d ed. 633.

"Courts, in construing or interpreting a statute, give much weight

to the interpretation put upon it at the time of its enactment and since by those whose duty it has been to construe, execute, and apply it." 26 Am. & Eng. Enc. Law 2d ed. 633.

" 'Contemporaneous construction,' within the meaning of the rule, is the construction which the executive department or officers charged with the enforcement of the statute give to it at or near the time of its enactment. The consideration to be accorded executive construction is also especially weighty in the case of statutes . . . levying impositions, where the executive construction has been in favor of the persons affected." 59 C. J. 1029.

"Executive construction is entitled to additional weight where it has been impliedly indorsed by the legislature, as by the re-enactment of the statute, or the passage of a similar one, in the same or substantially the same terms." 59 C. J. 1030.

"The re-enactment of a statute, or the passage of a similar one, in the same terms, after it has received a practical construction by the executive or administrative departments of the government, or by the legislature itself, is an adoption of such construction, or is, at least, highly persuasive, especially where the original statute has been repeatedly re-enacted since its executive construction; and a subsequent executive construction contrary to the original one is not entitled to weight." 59 C. J. 1064, 1065; 2 Lewis's Sutherland, Stat. Constr. 2d ed. 780; Van Veen v. Graham County, 13 Ariz. 167, 108 P. 252; New York L. Ins. Co. v. Burbank, 209 Iowa 199, 216 N. W. 742; Wayne County v. Fuller, 250 Mich. 227, 229 N. W. 911; Copper Queen Consol. Min. Co. v. Territorial Bd. of Equalization, 206 U. S. 474, 51 L. ed. 1143, 27 S. Ct. 695.

"In the interpretation of re-enacted statutes the court will follow the construction which they received when previously in force. The legislature will be presumed to know the effect which such statutes originally had, and by re-enactment to intend that they should again have the same effect." 2 Lewis's Sutherland, Stat. Constr. 2d ed. 780, 781; National Lead Co. v. United States, 252 U. S. 140, 64 L. ed. 496, 40 S. Ct. 237; Nagle v. Loi Hoa, 275 U. S. 475, 72 L. ed. 381, 48 S. Ct. 160; Brewster v. Gage, 280 U. S. 327, 74 L. ed. 457, 50 S. Ct. 115; United States v. Dakota-Montana Oil Co. 288 U. S. 459, 77 L. ed. 893, 53 S. Ct. 435; McFeely v. Commissioner of Internal Revenue,

296 U. S. 102, 80 L. ed. 83, 56 S. Ct. 54, 101 A.L.R. 304; Hassett v. Welch, 303 U. S. 303, 82 L. ed. 858, 58 S. Ct. 559.

Contemporaneous construction by officers called upon under their official oaths to inaugurate and administer a new system (1 Cooley, Const. Lim. 8th ed. 147) of taxation "during a period of time when the search for new subjects of taxation and for additional revenue has been anxiously prosecuted carries with it great weight." Musgrove v. Baltimore & O. R. Co. 111 Md. 629, 75 A. 245.

There is at least as strong a presumption that the members of the 1937 Legislative Assembly knew and approved of the contemporaneous and practical construction that had been placed upon the 1935 Sales Tax Act, as there would have been that they had knowledge and approved of judicial decisions of another state if, instead of re-enacting the 1935 Act, the Legislative Assembly had adopted such act from another state, with a construction placed thereon by the courts of the state from which it was adopted similar to that placed by the tax commissioner upon the provisions of the 1935 Act. Copper Queen Consol. Min. Co. v. Territorial Bd. of Equalization, 206 U. S. 474, 51 L. ed. 1143, 27 S. Ct. 695..

The plaintiff carried on his activities as a photographer in accordance with, and in reliance on, the construction placed upon the Sales Tax Act at the time the Sales Tax System was put into operation by the executive officer designated in the law to put the system into operation and to administer and enforce the law. Plaintiff is now required to pay taxes, which he refrained from collecting from his patrons under the ruling of the tax commissioner. The departure from the contemporaneous and practical construction upon which plaintiff properly relied will obviously work injustice to him and to all photographers and should not receive the sanction of the courts except for the most cogent reasons. United States v. Alabama G. S. R. Co. 142 U. S. 615, 35 L. ed. 1134, 12 S. Ct. 306; 59 C. J. 1029, 1030.

It is suggested that the legislative enactments of 1939 and 1941 lend force to the construction contended for by the tax commissioner and sustained by the majority. It seems to me there is no substantial basis for this suggestion. It is conceded that during the entire period of its existence the 1935 Sales Tax Act was construed only one way,—that the compensation paid to a photographer for portraits made to order

for sitters is not subject to the sales tax. The 1937 Legislative Assembly enacted a complete new sales tax act. Laws 1937, chap. 249. In the 1937 Act the legislature adopted, without change, every provision of the 1935 Act that is material here. If the terms of the 1935 Act did not apply to and render taxable the compensation paid to a photographer for photographs made to the order of sitters, neither did the 1937 Act. The 1937 Legislative Assembly apparently did consider whether certain transactions that had been held subject to tax under the 1935 Law should be exempted, and they provided that gross receipts from the sale by any school board of this state of books and school supplies to regularly enrolled students at cost should be exempted from the sales tax. Laws 1937, chap. 249, § 3, subd. (e). At that time it was understood that the compensation paid to a photographer by a sitter was not subject to a sales tax, and the legislature adopted and incorporated into the 1937 law, without change, the provisions of the 1935 law that had been construed as rendering such compensation not subject to a sales tax.

The 1939 Legislative Assembly did not enact a new law, neither did it re-enact the whole of the 1937 law. It amended and re-enacted only two sections of the 1937 Act, § 2 (which prescribed the rate of taxation, the period of time during which the tax should be imposed, and defined the sales to which it applied), and § 25 (which provided for the allocation of moneys collected under the act). The only change made in said § 2 was to substitute in the 1939 Act, the words, "beginning on the first day of July, 1939, and ending June 30th, 1941," for the words, "beginning the first day of May, 1937, and ending June 30th, 1939," in the Act of 1937. The change made in § 25 had no bearing upon the imposition of the sales tax at all, or what transactions are, or are not, subject thereto.

The language of the 1939 enactment indicates that aside from the change in the allocation of the revenues collected under the act, the legislature intended to retain in force, without change, the provisions enacted in 1935 and adopted in the 1937 Law. The record does not show whether, or to what extent, the tax commissioner was enforcing or attempting to enforce the collection of sales taxes against photographers; but the record shows affirmatively and without dispute that

there had been no enforcement against the plaintiff, and there was no levy against him, until September 5th, 1939.

The 1941 enactment is not in itself a complete law. Senate Bill No. 40, Laws 1941. It re-enacts § 2 of the 1937 Law, as amended by the 1939 enactment. The only change in this section is to provide that the sales tax shall be imposed for a period "beginning the first day of July, 1941, and ending June 30, 1943." The 1941 enactment "re-adopts" a number of sections of the 1937 Law, and amends and re-enacts certain others. At the time the 1941 legislative enactment was adopted, the lawmakers were confronted with this situation: The district court of Cass county had, by the decision in this case, rendered in April, 1940, held that the sales tax did not apply to the compensation paid to a photographer for photographs taken and made to order for a sitter. The district court of Cass county did not merely file a formal order to that effect, it filed a carefully prepared decision, wherein it cited and analyzed the authorities, and quoted the ruling made under the 1935 Act. Senate Bill No. 40, Laws 1941, was introduced by the Senate Committee on Taxes and Tax Laws. Senator Fowler, the chairman of that committee, is a member of the bar and a resident of the city of Fargo, in Cass county. If any presumption is to be indulged as to the 1941 enactment it seems to be at least as likely that the lawmakers knew, and approved of the construction that had been placed upon the former laws in the carefully considered opinion filed by Judge Holt, as that they disapproved of that construction, and approved the contrary construction of the tax commissioner which had given rise to Judge Holt's decision.

But laying on one side the question of contemporaneous and practical construction, it seems clear that the construction by the tax commissioner in 1935 was, and is, correct. It is in harmony with the recognized legal relations between the parties, where a photographer takes a photograph for, and at the instance of, a sitter.

"The relation between the photographer and his patron is one of employment." 4 Williston, Contracts, Rev. ed. p. 2833, note 6;

"It is settled law that the ordinary contract between a photographer and his customers is a contract of employment. The conception as well as the production . . . is work done for the customers, and they, not their employee are the exclusive owners of all proprietary

rights." White Studio v. Dreyfoos, 156 App. Div. 762, 763, 142 N. Y. S. 37, 38.

"The usual contract between a photographer and his customer is one of employment. The production of the photograph is work done for the customer, not for the photographer, and the sitter is entitled to all proprietary rights therein." Lumiere v. Robertson-Cole Distributing Co. (C.C.A. 2d) 280 F. 550, 24 A.L.R. 1317.

In discussing the question of the right of copyright as between a photographer and a patron, Corpus Juris Secundum (18 C. J. S. p. 146) says: "Where a photographer takes a portrait for a sitter, under employment by the latter, it is the implied agreement that the property in the portrait is in the sitter, and neither the photographer nor a stranger has the right to publish or make copies without permission from the sitter."

Such construction is also in harmony with the common everyday conception of the transaction between a photographer and his patrons. A person who goes to a photographer to arrange for the taking of a photograph of himself or a member of his family, does not have in mind that he is about to purchase "goods, wares or merchandise." A mother who takes her child to a photographer to have a photograph taken does not say, "I want to buy a photograph of my child." She informs the photographer that she desires to have the child sit for a photograph and have the photographer take it. She employs the photographer to do the work necessary to produce the photograph, with the understanding that if the proofs are satisfactory photographs will be made and the photographer will be paid for the services he has performed in taking, developing and producing the photographs. The material used is merely incidental. According to the evidence in this case, the paper and chemicals utilized in making the photographs that were introduced in evidence in this proceeding, in no instance amounted to more than 2.1% of the compensation paid to the photographer, and as to some photographs was as low as 1.1% of such compensation.

There is an obvious difference between a sale of future goods and a transaction between a photographer and a patron for whom a photograph is to be made after a sitting. If a tailor makes a suit of clothes, or a cabinet-maker makes a bookcase to order, the buyer (in absence of special circumstances or stipulations) has no proprietary

rights in the suit or bookcase until there has been a delivery and acceptance. 55 C. J. 550, 551. In absence of special circumstances there is no implied stipulation in either case that other articles of the same kind and style shall not be made and sold to others. If the person for whom the suit or bookcase has been made refuses to accept and pay for the same, all the remedies afforded by law to the seller, including the right of resale, are available to him. Not so, however, with a photographer who is employed by a sitter to take and make a photograph. In such case the sitter acquires all proprietary rights in the portrait that may be made as a result of sitting. 18 C. J. S. pp. 146, 159; annotation in 24 A.L.R. 1320. Even though the photographer retains title to the negative he has no proprietary rights in the portrait that may be produced from it. The photographer may use the negative only in furtherance of his employment. His rights of ownership of the negative are limited by the implied stipulation in the contract of employment that the negative "shall be only used for the printing of such photographic portraits as the customer may order or authorize." Moore v. Rugg, 44 Minn. 28, 46 N. W. 141, 9 L.R.A. 58, 20 Am. St. Rep. 539; annotation in 24 A.L.R. 1320 et seq.; Bennett v. Gusdorf, 101 Mont. 39, 53 P. (2d) 91; McCreery v. Miller's Groceteria Co. 99 Colo. 499, 64 P. (2d) 803; Klug v. Sheriffs, 129 Wis. 468, 109 N. W. 656, 7 L.R.A.(N.S.) 362, 116 Am. St. Rep. 967, 9 Ann. Cas. 1013, supra; Levyeau v. Clements, 175 Mass. 376, 56 N. E. 735, 50 L.R.A. 397, and annotation.

If the photographer, without the consent of the patron, makes photographs for his own use or for others, he violates the legal rights of such patron, and may be held accountable for such violation in an appropriate legal or equitable action. If the person for whom photographs are made refuses to accept and pay for them, the remedy of the photographer is not for the breach of a contract for the sale of goods, wares or merchandise, but for the breach of a contract of work and service. Racklin-Fagin Constr. Corp. v. Villar, 156 Misc. 220, 281 N. Y. S. 426. See also Sidney Stevens Implement Co. v. Hintze, 92 Utah 264, 67 P. (2d) 632, 111 A.L.R. 331. Obviously, the right of resale, available to a seller where the buyer has breached a contract of sale, will not be available to the photographer in case the patron refuses to accept and pay for the photographs. In case of such

refusal the photographer cannot sell the photographs except upon the authorization of the sitter, nor can he exhibit them or otherwise devote them to his own use, except with the permission of the sitter. Actually, the photographs will be worthless for all purposes but waste paper.

In my opinion the decision of the trial court is correct, and should be affirmed.