**COMMUNITY TELECASTING SERVICE d/b/a W A B I Television**

**v.**

**Ernest H. JOHNSON, State Tax Assessor.**

Supreme Judicial Court of Maine.

June 13, 1966.

MARDEN, Justice.

On report, including pleadings, exhibits, statement of facts and deposition, following a complaint seeking review of the administrative action of the State Tax Assessor assessing sales and use taxes under the provisions of Chapter 17, R.S.1954, as amended.

Plaintiff was engaged in the television broadcasting business. In connection with that business and by contract with customers, it prepared art work and slides to be televised for the purpose of advertising customer's business. These contracts with the customers provided that for consideration plaintiff would furnish services of its staff to create advertising material at cost which upon being photographed became films or slides designed for telecasting, and, for additional consideration, to display the same by its television facilities at stated frequencies. The customer agreed "that advertising copy material and program material both audio and video created by WABI–TV for us remains the property of WABI–TV for five years beginning with the date of first use on WABI–TV" and that the customer should not use such WABI–TV created material in any other advertising program without consent of WABI–TV.

By notice dated January 17, 1963 defendant deficiency-assessed the plaintiff a sales tax for the period November 1, 1960 to October 31, 1962, based upon charges made by plaintiff to its customers in the preparation of this advertising material,—excluding the charge for air time. Plaintiff contends that such transactions were nontaxable.

Also as part of plaintiff's operation it contracted in August of 1960 with American Research Bureau, Inc., (ARB), and in May of 1961 with Neilsen Station Index Services (Neilsen), to survey its market area and to analyze its television audience for the purpose of shaping its advertising program to the most profitable use of its air time. These contracts between WABI–TV and the market analysts provided that for a stated consideration each analyst would make such

Eaton, Peabody, Bradford & Veague, by Malcolm E. Morrell, Jr., Bangor, for plaintiff.

Jon R. Doyle, Asst. Atty. Gen., Augusta, for defendant.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN, RUDMAN, and DUFRESNE, JJ.

Rescript

survey and report its findings in written form with a certain number of copies of the report included in the contract price and additional copies available at stated prices.

Neilsen furnished one master copy of its report issued in March and November annually to the general Manager of WABI–TV with additional copies available at a net charge of $1.00 each. WABI–TV purchased thirty extra copies of the March, 1961 report and twenty-seven extra copies of the November, 1961 report. These reports were for the confidential use of WABI–TV and its sales representatives, and to others having a "legitimate business interest in the subject of the report" and were not to be loaned to nonsubscribers. WABI–TV agreed to return all extra copies of the reports more than two years old to Neilsen on demand, or to certify destruction of copies not returned. The contract price for a survey over a period of two years was $165.75 per month.

The contract with ARB was similar in nature. The contract price for the annual market survey was $3,181.60 and entitled WABI–TV to thirty copies of each issue of the market report (March and November) with additional copies available at $2.00 each. WABI–TV purchased twenty-three extra copies of each of the November, 1960, March, 1961, November, 1961, and March, 1962, reports. These reports also were for the "exclusive and confidential use of ARB subscribers" and might "be disclosed only to Advertisers and/or their agencies who have a bona fide business interest in the data therein contained" and to divulge the contents of these reports or to lend or give a copy to a nonsubscriber constituted a breach of the agreement. Defendant on January 17, 1963 deficiency-assessed plaintiff a use tax based upon the charge paid by plaintiff to the two rating services. Plaintiff contends that this charge is nontaxable.

The issues in the case involved the taxability of the art work as a "sale" and the market reports as a "use" by the plaintiff, based upon their respective "prices." Plain-

tiff urges that it was selling service as to the art work and slides and buying service as to the market survey, no tangible personal property being involved.

▮ The taxability in each case depends first upon whether the matter involved was tangible personal property sold at retail within the meaning of the tax law. The burden of establishing tax exemption is on the plaintiff. Section 9, Chapter 17 R.S. 1954; W. S. Libbey Company v. Johnson, 148 Me. 410, 420, 94 A.2d 907.

The following citations refer to the statutes then in effect. Chapter 17 R.S.1954, as amended, contained the following provisions:

*"Sec. 3. Sales tax.*—A tax is imposed * * * on the value of all tangible personal property, sold at retail, * * *, measured by the sale price, except as in this chapter provided. * * *."

*"Sec. 4. Use tax.*—A tax is imposed on the * * * use * * * of tangible personal property, purchased at retail sale * * *."

*"Sec. 2. Definitions.*

" * * *

" 'Business' includes any activity engaged in by any person or caused to be engaged in by him with the object of gain, benefit or advantage, either direct or indirect."

" 'Retail sale' or 'sale at retail' means any sale of tangible personal property, in the ordinary course of business, for consumption or use, or for any purpose other than for resale, except * * *. The term * * * includes conditional sales, * * * and any other transfer of tangible personal property when the title is retained as security for the payment of the purchase price and is intended to be transferred later. * * *."

" 'Sale' means any transfer, exchange or barter, in any manner or by any means

whatsoever, for a consideration in the regular course of business * * *."

" 'Sale price' means the total amount of the sale * * * including any services that are a part of such sale, * * *, the cost of the materials used, labor or service cost, * * *."

" 'Tangible personal property' means personal property which may be seen, weighed, measured, felt, touched or in any other manner perceived by the senses, * * *."

" 'Use' includes the exercise in this state of any right or power over tangible personal property incident to its ownership when purchased by the user at retail sale."

*Sales Tax*

■ Preliminarily we inquire whether the transaction involving the art work and slides was a sale of "service" or tangible personal property. Based upon cases discussing this aspect of the problem, certain factual features assume importance. It has been held that where the creation of property to be transferred requires high skill and the materials involved are of relatively little value and the principal value of the finished product lies in the services to be rendered, and the product is of little value to anyone other than the buyer, the transaction may be deemed a sale of service rather than goods. The relative dollar value of the service as against that of the product, sometimes expressed in percentages, has been held significant. J. A. Burgess Co. et al. v. Ames (1935) 359 Ill. 427, 194 N.E. 565 (blue printing, photography); Mahon v. Nudelman (1941) 377 Ill. 331, 36 N.E.2d 550 (fur repair); Berry-Kofron Dental Laboratory Co. v. Smith (1940) 345 Mo. 922, 137 S.W.2d 452 (dentures, etc., for dentists); and Washington Printing & Binding Co. v. State (1937) 192 Wash. 448, 73 P.2d 1326 (printing, materials 14% of total charge) all non-taxable.

■ The fact that property the subject of a sale is custom made and that labor is the principal cost factor does not establish the contract as one for rendition of services rather than sale. Bigsby v. Johnson (Cal. 1940) 99 P.2d 268 (printer's mats and composition); Voss v. Gray (1941) 70 N.D. 727, 298 N.W. 1 (photographs); and Warshawsky & Co. v. Department of Finance (1941) 377 Ill. 165, 36 N.E.2d 233 (sale of rebuilt motors); all taxable.

■ The cost price of any commodity includes skill of manufacture and within our statute "services that are a part of such sale" are within our definition of "sale price." Same also in Wray's Pharmacy, Inc., et al. v. Lee (1941) 145 Fla. 435, 199 So. 767 (filling of drug prescriptions, taxable).

■ And the transaction is to be determined by its character under the statute rather than the phrasing of the contract involved. Kistner v. Iowa State Board of Assessment and Review (1938) 225 Iowa 404, 280 N.W. 587 (mortician's sale of funeral supplies, taxable).

■ The facts of the present case do not yield the criteria discussed above and the transaction is not established as a "service" transaction.

Removing the "service" contention of plaintiff, that the art work and slides prepared by plaintiff fall within the definition of tangible personal property, supra, that the transaction between plaintiff and its customer was in the ordinary course of plaintiff's *operations*, and that the tangible personal property was not for resale, is not in issue. The controversial question is whether the transaction between plaintiff and its customers was a sale in the ordinary course of *business* within the meaning of the statute.

■ "Sale" within the statute covers a broad range of dealings involving the transfer of personal property in the regular course of business. Basically it is the passage of title from seller to buyer for a

price. Section 1, Chapter 185 R.S.1954, then applicable.

It was determined in Bonnar-Vawter, Inc., v. Johnson 157 Me. 380, 385, 173 A.2d 141, 144, that the fact that the transfer of personal property was profitless is not determinative of "business" within the statute, and while plaintiff urges that the consideration paid for the art work and slides was fixed only by the cost to plaintiff and it is not clear whether this cost includes labor, material, overhead, depreciation, and taxes, the presence or absence of such inclusion is not significant. Whatever the basis of the "cost price" between plaintiff and customer was, the transaction had an "object of gain, benefit or advantage" within the rationale of *Bonnar-Vawter* and it was in the regular course of business.

It is established that the title retention clause of the contract was not for financial security, but both for competitive security and for protection of the slides from soilage and breakage. Because the title retention provision was not security for the payment of the purchase price the transaction is not a conditional sale within the meaning of the statute, but the fact that the statute imposes a sales tax upon a transaction, one distinguishing feature of which is a deferred passage of title, records legislative intent. It is implicit by the terms of the contract that title to the slides pass to the customer at the end of the five year period and at that time he would be entitled to delivery upon demand. During the five year period, while the customer had neither title nor physical possession, he nevertheless has certain control of the slides,—in that he determined if and when they would be displayed by plaintiff. It may be said that during that period plaintiff had title and custody of this property, but that the customer was in limited constructive possession. See Jacobson v. Aetna Casualty & Surety Co., 233 Minn.

383, 46 N.W.2d 868, (Col. 2) 871, and Rodella v. United States, 9 Cir., 286 F.2d 306 [11], 311, in which latter case it is said:

"Constructive possession is that which exists * * * without actual personal present dominion over a chattel, but with an intent and capability to maintain control and dominion."

This delay in passage of title and right to physical possession does not remove the trade from the category of a sale.

The transaction between plaintiff and the customer was a sale within the meaning of the tax act and is taxable as such.

*Use Tax*

The "use" taxability of the transaction between plaintiff and the market analysts also turns upon the "service" element and whether a retail sale of tangible personal property occurred, but there must be both a "purchase" and a "use." Trimount Coin Machine Co. v. Johnson, 152 Me. 109, 112, 124 A.2d 753.

By virtue of extensive litigation in the State of New York, involving its New York City Retail Sales Tax Law, precedents have been created dealing with the type of transaction as here occurred. The leading cases are Dun & Bradstreet, Inc. v. City of New York et al. (1937) 276 N. Y. 198, 11 N.E.2d 728 (credit reports); Matter of Moody's Investors Service v. McGoldrick (1939) 280 N.Y. 581, 20 N.E. 2d 25, affirmed without opinion (data on securities); Stampers Arrival of Buyers, Inc. v. City of New York (1946) 296 N. Y. 574, 68 N.E.2d 871 (publication giving daily arrival and location of out of town buyers); and Business Statistics Organization, Inc. v. Joseph (1949) 299 N.Y. 443, 87 N.E.2d 505 (Babson's Business Service). The New York law under which the

cited cases arose was so similar in its definition of "sale"[1] to our statute that they are of particular interest, and establish principles to which we subscribe.

The business relationships between plaintiff and both ARB and Neilsen fall into one pattern. The analysts surveyed the geographical area reached by WABI–TV for the purpose of rendering a report ("Market Report" by ARB, "Station Index" by Neilsen) showing the exposure within that area to the programs,—and presumptively the advertising, televised.

The cost to plaintiff of the survey and reporting by ARB was $3,181.60 per year, by Neilsen $3,978.00 for a two year period. As stated earlier in the opinion these contract charges covered from ARB the survey and thirty copies of each semi-annual report, from Neilsen one master copy of each semi-annual report. Additional copies of these reports were available, and were purchased, at a stated price per copy, $2.00 each of the ARB and $1.00 each of the Neilsen.

ARB measured the home reception by placing diaries with sample families, and by prior arrangement, which diaries were designed to reflect "all viewing by all members of the family" while the home receiver was in operation. Sample families were chosen so as to represent every rural and urban telephone home in the area having a television receiver. Underlying all of this were statistical techniques, the elaboration on which is not necessary. The results were tabulated in a report, showing plaintiff's share of audience; number of homes reached on week days and Sundays within the following periods: Sign-on to 9:00 A.M., 9:00 A.M. to noon, noon to 3:00 P.M., 3:00 P.M. to 6:00 P.M., 6:00 P.M. to 10:00 P.M., 10:00 P.M. to midnight; and the same for every quarter hour during the week reported giving program titles most representative of the time segment of the members of men, women and children viewing. Physically these reports, as exhibited, consisted of seven or eight 8½ x 11 inch sheets folded and stapled to form a booklet 4¼ x 11 inches with 14–16 pages the content having the appearance of photographic reproduction.

Neilsen measured home reception and audience composition by similar approach. The record of set tuning activity was obtained either by, what Neilsen termed, "Audimeters" or "Audilogs." The "audilogs" were hand prepared diaries in which home reception by quarter hour intervals was recorded. This diary was backed up by a device called a "recordimeter" which through automatic sound and sight signals reminded the sample family to make the diary entries. The audimeter was an automatic recording device which provided minute by minute records of home receiver operation as to each broadcasting station selected by the collaborating home. The report to plaintiff was similar to ARB's but covered a period of four weeks and divided the viewers into men, women, teenagers (12–18 years of age) and children (4–11 years of age). Physically these reports, as exhibited, consisted of 32 8½ x 11 inch sheets folded and stapled to form a booklet of 64 pages, with the same appearance of photographic reproduction.

To categorize these deals as retail sales of tangible personal property we would have to say that the consideration, called the price, for these reports, supplied as an integral part of the contract, was in case of ARB $3,181.60 for thirty copies of each semi-annual report and in case of Neilsen $3,978.00 for one master report every six months for two years. The price of additional copies was not more than $2.00 each from either analyst. All reports were confidential to plaintiff and publication to

1. New York City Retail Sales Tax Law, Sec. N41–1.0(7) defining "Retail Sale" or "sale at retail" as " * * * A sale of tangible personal property to any person for any purpose other than" for resale or to become a physical component of * * *.

others was closely circumscribed. These reports had intrinsic value only for a limited time and only to merchandisers by television in the geographical area covered. The market, if any, to buyers other than plaintiff, was extremely limited. The life of the report, for its purpose, was only until the succeeding report appeared. Plaintiff was buying statistical service, not books. See "service" discussion and citations, supra.

The format, content and appearance of the report was nothing to which a price expressed in four figures could be attached. The prices affixed to the additional copies were considered adequate for each copy as an item of personal property. Copies were available to purchasers not parties to the contract from which they originated, at what cost is not recorded.

The transaction does not represent a sale of these pamphlets by ARB at roughly $50.00 each, or by Neilsen at approximately $994.50 each. It represents the performance of a service,—the market survey, the booklets being an incidental means of reporting the confidential result. But for convenience in reproduction and inclusion in each report standard explanatory text and definitions of terms, the information could have been returned to plaintiff in letter form.

While Dun & Bradstreet, Inc. v. City of New York et al. (1937) 11 N.E.2d 728, is not identical to our present case,[2] the factual difference we do not consider of such significance as to render the principles inapplicable.

The decision in *Dun* holding its transactions as nontaxable was based on three factors: (1) the title to the books remained in Dun, (2) no charge was made to the subscribers for the use of the books separate and apart from the charge of services, and (3) the books were considered as furnished only as an incident to the services of furnishing the information.

Factors (1) and (2) are comparable to our present case and the court said as to (3), upon which it heavily relied:

"The information collected by appellant at great expense is secured to enable it to furnish to its subscribers detail information to guide them in making sales and in extending credit. The information furnished is of value to the subscribers and for it they pay but not for the paper upon which the information is conveyed or for the reference books which are only guides to assist in the rendition of appellant's service. One does not think of a telephone company as a seller of books to its subscribers. It renders a service. To make that service efficient, it furnishes its subscribers with books containing a list of its subscribers with their call numbers. 'The paper is a mere incident; the skilled service is that which is required.'" *Dun,* supra, [5] 731.

See also Stampers Arrival of Buyers, Inc. v. City of New York (1946) 296 N.Y. 574, 68 N.E.2d 871 and Booth v. City of New York (1944) 268 App.Div. 502, 52 N.Y.S.2d 135 (transcription of record by court reporter) and United Aircraft Corp. v. O'Connor (1954) 141 Conn. 530, 107 A.2d 398 [3, 4], 402 (research engineering with resultant experimental engines) upon similar rationale, and which transactions were held nontaxable.

In the present case plaintiff was buying the survey, not the *product* of the survey as tangible personal property. The distinction is discernible in Matter of Moody's Investors Service v. McGoldrick [3] (N.Y.1939)

2. In that the reference books supplied by *Dun* could not be obtained separate and apart from the service furnished subscribers. 11 N.E.2d [1] 730. Plaintiff is the compiler and publisher of the well known credit reports.

3. This case and that of Matter of Moody's Investors Service v. Taylor is the same case. It appears that Joseph D. McGoldrick succeeded Frank J. Taylor as Comptroller of the City of New York and respondent in the case. See the case with

20 N.E.2d 25 memorandum report of which is found in 280 N.Y. 581, which, with editorial comment in 7 Tax Law Review 98, footnote 22, and discussion of Moody's in Business Statistics Organization, Inc. v. Joseph, 299 N.Y. 443, 87 N.E.2d 505, 507 establishes that the Moody's investment publications and manuals were held to have been sold, and the transaction taxable. The Moody publications were the product of a continuing service for the business and financial community at large. No one buyer contracted for the service of compilation, the *product* was the merchantable item and was "freely transferrable and having an independent market value in the hands of the purchaser disassociated from any personal and individual services rendered by the seller." *Joseph,* at 507.

■ The State of Illinois, in interpreting its Retailer's Occupation Tax Act, has expressed a rule which commends itself:

"If the article sold has no value to the purchaser except as a result of services rendered by the vendor and the transfer

Taylor as respondent in 254 App.Div. 726, 5 N.Y.S.2d 765, and 254 App.Div. 836, 6 N.Y.S.2d 332.

4. See "What is a Sale for Sales Tax Purposes?" Vanderbilt Law Review (1955–

of the article to the purchaser is an actual and necessary part of the service rendered, then the vendor is engaged in the business of rendering service and not in the business of selling at retail. If the article sold is the substance of the transaction and the service rendered is merely incidental to and an inseparable part of the transfer to the purchaser of the article sold, then the vendor is engaged in the business of selling at retail, and the tax which he pays * * * (is measured by the total cost of the article and service)." Snite v. Department of Revenue (1947) 398 Ill. 41, 74 N.E.2d 877 (4–6], 879, 880.

The Illinois rule is a distillation from a multivariety of cases and factors which show, as is inevitable, that the problem is not in the formulation of a rule but in its application.[4] The two phases of this case fall within the cited rule.

Appeal denied as to "sales" tax.

Appeal sustained as to "use" tax.

56) Page 227; 7 Tax Law Review, Notes Page 94; State and Local Taxation, Hellerstein 343–351, Annotations 98 A.L.R. 837, 111 A.L.R. 943, and 139 A.L.R. 372.