COMPTROLLER OF THE TREASURY, STATE OF MARYLAND *v.* THE CHESAPEAKE AND PO-TOMAC TELEPHONE COMPANY OF MARYLAND

[No. 187, September Term, 1965.]

346

*Decided February 9, 1966.*

The cause was argued before MARBURY, OPPENHEIMER and BARNES, JJ., and EVANS and CHILDS, JJ., Associate Judges of the Fifth Judicial Circuit, both specially assigned.

*Thomas P. Perkins, III, Assistant Attorney General,* and *Edward F. Engelbert, Chief, Retail Sales Tax Division,* with

whom was *Thomas B. Finan, Attorney General,* on the brief, for the appellant.

*Walker Lewis,* with whom were *Frank M. Steadman, Jr., Howard C. Anderson* and *Clifford Davis, Jr.,* on the brief, for the appellee.

MARBURY, J., delivered the opinion of the Court.

At issue is whether appellee, The Chesapeake and Potomac Telephone Company (Telephone Company), is subject to Maryland retail sales tax on the money received from certain subscribers for the use of private line teletypewriter facilities. The appellant, Comptroller of the Treasury, claims that this money is payment for the rental of tangible personal property (equipment) and is subject to the tax under the following definition of "sales" set out in Code (1965 Replacement Vol.), Article 81, Section 324 (d):

> "'*Sale*' and '*selling*' mean any transaction whereby title or possession, or both, of *tangible personal property* is or is to be transferred by any means whatsoever for a consideration including *rental,* lease or license to use, or royalty, by a vendor to a purchaser, or any transaction whereby services subject to tax under § 325 of this subtitle are rendered for consideration to any purchaser by any vendor. Such consideration may be either in the form of a price in money, rights or property or by exchange or barter, and may be payable immediately, in the future, or by installments. * * *." (Emphasis added.)

The appellee Telephone Company contends that it is not obliged to pay the tax mentioned in Section 325 by virtue of the exemption granted to those who supply communication services, as defined in Section 326 (n) of the same Article, to wit:

> "326. Exemptions.
> The tax hereby levied shall not apply to the following sales:
> * * *

(n) *Transportation and communication services and newspapers.*—Sales of transportation and communication services, including the printing and sales of newspapers of any and all types."

The sole question to be resolved on this appeal is whether the Telephone Company is furnishing to its teletypewriter subscribers a communication service, or is it renting to them tangible personal property, *i.e.,* equipment.

The facts which give rise to this appeal were adduced at a hearing before Edward A. Smith, a hearing officer for the appellant Comptroller's office, who considered various exhibits introduced by both parties, as well as the testimony of the lone witness at the hearing, Joseph B. Stack, an employee of the Telephone Company for some twenty-three years, who testified on behalf of the appellee herein. At the conclusion of the hearing, Smith filed an opinion in which he concluded that the Telephone Company was subject to the sales tax imposed by Article 81, Section 325, since in his view the money was received by it from its subscribers for the rental of tangible personal property. Pursuant to Article 81, Section 352, an appeal was taken from the Comptroller's decision to the Baltimore City Court, and on that appeal Judge Cullen reversed the Comptroller's final determination and found that the payments here involved were exempt since they were deemed to be payments for communication services and thus not subject to the sales tax. The Comptroller has appealed Judge Cullen's decision and accompanying order.

The appellee's telephone and teletypewriter operations can be conveniently divided into two categories: "Exchange Service" and "Private Line Service". In the Exchange Service the subscriber is able to communicate with all other subscribers to the service, whereas in Private Line Service, the subscriber is limited to communication between specified locations, but has exclusive use of the communication channels connecting those locations. Except for the difference between oral and written communications, the telephone and teletypewriter services supplied by the appellee are closely comparable. In each the sending and receiving instruments are located on the premises of the sub-

scriber, in each the subscriber himself may send and receive messages, in each the function of the appellee Telephone Company is to furnish and maintain the communication channels and the instruments at either end so that the subscriber can communicate satisfactorily. In the above respects there is no difference between telephone and teletypewriter or between private line service and exchange service. These similarities have some significance to the resolution of the instant question since the appellant admits that payment for exchange telephone service is payment for communication service within the Section 326 (n) exemption.

Involved in the present appeal are private line teletypewriter networks furnished by the Telephone Company to seven subscribers in this State. The largest subscriber is the Bethlehem Steel Company, and the present proceeding arose out of an inquiry made by the Comptroller as to the private line teletypewriter networks furnished to it by the appellee. For this reason, and because Bethlehem has the most complicated teletypewriter system, the evidence in the present case was adduced primarily with respect to Bethlehem Steel, although both parties to this appeal concede that the same principles apply to all seven subscribers.

The appellee Telephone Company furnishes four private line teletypewriter networks to Bethlehem Steel: (1) The Interstate Network, (2) the Steel Production Network, (3) the Transportation Network, and (4) the Shipyard Network. While the Interstate Network is not deemed by the appellant to be subject to the Maryland sales tax, testimony was introduced into evidence concerning that network, since it constitutes an integral part of the teleptypewriter communication system supplied to Bethlehem. The Interstate Network connects the principal office of Bethlehem Steel Company in Bethlehem, Pennsylvania, with its Sparrows Point plant and other plants, and the network is used to communicate information relating to orders and production.

The Steel Production Network is used to control steel production at the Sparrows Point plant, and it connects the executive offices there with the laboratory and with the open hearth locations at which the steel is actually produced. This

Steel Production Network is made up of nineteen teletypewriters interconnected by cable; all of the stations within this network are located at the Sparrows Point plant.

The Transportation Network is used for communications controlling the movement of material into and out of the Sparrows Point plant, and it is comprised of seven teletypewriters interconnected by cable. Three of these are within the Steel Company's office building, while the other four are located at the local railroad yards of the Western Maryland Railway Company, the Baltimore and Ohio Railroad Company, and two yards of the Pennsylvania Railroad Company. Three of these yards are at Sparrows Point, the fourth, the Wise Avenue yard of the Pennsylvania Railroad, is outside the confines of the plant.

Lastly, the Shipyard Network connects the various offices and departments of the Key Highway plant of Bethlehem Steel and is used for communications controlling ship repair work done there. The Shipyard Network is composed of twelve teletypewriters interconnected by cable, with all the teletypewriters located at the Key Highway plant of Bethlehem.

In all four of the above teletypewriter networks, the Telephone Company owns, installs and maintains not only the transmitting and receiving instruments, but also the wires, cables and other apparatus connecting them. All the plants involved in the present case have both telephone and teletypewriter service, and the telephones are connected through the same cables as the teletypewriters, albeit by different wires.

The subscribers furnish their own operators for the Telephone Company's teletypewriters, as well as the electricity for their operation. In the case of the Transportation Network and the Interstate Network, the teletypewriters are connected through the Telephone Company's central office located at 320 St. Paul Place, Baltimore, Maryland, whereas in the case of the other networks the teletypewriters are interconnected locally. The means used to furnish communication paths between stations in private line networks are exclusively within the discretion of the Telephone Company and the method used to interconnect these stations does not affect the rate charged the subscriber, who ordinarily does not know or care how the con-

nections are made, his interest being limited to his ability to communicate.

Pursuant to Code (1957), Article 78, Section 28 (a), the Telephone Company is required to file with the Public Service Commission tariff schedules of its rates and charges. The Company is not permitted to furnish the services covered by such schedules except in accordance with the terms thereof. Section 29-A of the Telephone Company's tariff, which has been filed with the Public Service Commission, specifically applying to private line teletypewriter networks, expressly defines such networks as a service, using the following language:

> "B 1.
>
> "Private line teletypewriter *service* and private line Morse service are those of providing the requisite facilities, including channels and station equipment, to enable the customer and authorized users to communicate by means of teletypewriter or Morse equipment between specified locations continuously or for regularly recurring periods at stated hours, seven days per week." (Emphasis added.)

The charges applicable to such networks are set out in Section 12 of the Company's tariff, dealing specifically with mileage and cable carrying charges. The tariff does not provide for a rental of equipment. Nevertheless, on at least two occasions, when the Telephone Company billed the Bethlehem Steel Company it used language in the bills which indicated some of the amount owed was for "Rental Teletypewriter Facilities". The Telephone Company's employee testified, however, that the language used in the bills was only a colloquialism and that it was often used to describe situations that are not rentals at all, for example, "rental on residence telephone."

All installation and maintenance work on the teletypewriters is done by employees of the Telephone Company under its exclusive control. The record showed affirmatively that employees of Bethlehem Steel are not permitted to install, repair or maintain such facilities, and the same is true of employees of other subscribers. Under the terms of the tariff on file with the Public Service Commission, the subscriber is not even permitted to

relocate the facilities on its own premises, but must have such relocation work done by the Telephone Company's employees. Furthermore, the appellee Telephone Company determines what replacements shall be made in order to keep the teletypewriters and communication channels in proper operating condition, and when distance requires amplifying equipment in order to boost the strength of the signals between the stations in the networks, such facilities are furnished by the Telephone Company without additional charge, it being its responsibility to see that the networks operate at a satisfactory level of efficiency at all times.

On this appeal the Comptroller does not appear to seriously dispute the fact that the teletypewriters here involved constitute a part of a communication system. He does, however, strenuously contend that a communication *service* is not being rendered by the appellee. In support of that contention three facts are stressed by the appellant which, it is argued, inveigh against the concept of service: (1) The subscribers and not the appellee supply the operators of the teletypewriters, (2) the appellee Telephone Company can not interrupt communications by its subscribers when they transmit messages over a private line teletypewriter, and (3) most of the teletypewriter equipment is stationed on the subscribers' premises.

The fact that the subscribers supply their own operators of the teletypewriters sheds little light upon the issue of whether a service is being rendered to them, since the subscribers to the appellee's telephone "exchange service" also operate the communicating instruments, and the monies received from these telephones, the Comptroller concedes, are within the Section 326 (n) exemption. Furthermore, in supplying nearly any type of communication service, the Telephone Company makes available the terminal instruments, as well as the communication paths connecting them, and the subscribers do the actual communicating. In the case of the telephone, a subscriber does this by dialing and talking, whereas in the case of the teletypewriter he communicates by depressing keys, but in both situations the sole function of the equipment is to transmit and to receive communications.

The other two facts stressed by the appellant on this appeal are founded on the presumption that retention of control over

the facilities used to communicate is necessary in order for the Telephone Company to supply a communication service. While the Telephone Company can not interrupt a given message over the private line teletypewriter exchange so as to allow another message to go through, as may be done in the Company's telephone exchange service, and most of the teletypewriter communication facilities are on the property of the subscribers, the Company does, however, retain other significant and vital means of control over this communication system. The appellee alone determines where the teletypewriters will be located within the plant, where the connecting wires shall be placed, how much amplification of messages is required, when to repair, replace, or relocate the machines and connecting wires.

Besides retaining these means of control over the teletypewriter communication system, additional support for the appellee's position can be found from the fact that the telephone business has been recognized by the United States Supreme Court as essentially a service business, (*Board of Public Utility Comrs. v. New York Teleph. Co.*, 271 U. S. 23, 70 L. Ed. 808) when, in analyzing the nature of the telephone business, the Court said at page 32 of 271 U. S.:

> "Customers pay for service, not for the property used to render it. * * * By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience * * *."

As to this concept of service there is no difference, in our view, between the Telephone Company's exchange business and its private line business. This was specifically held by the Interstate Commerce Commission in *Private Wire Contracts*, 50 I. C. C. 731 (1918). There, in analyzing its jurisdiction over private wire contracts of telegraph companies the Commission said at pages 756-57:

> "Some question is raised regarding our jurisdiction on the ground that respondents are subject to the Act only in so far as they are engaged in 'the transmission of messages,' and that in rendering the private wire service they merely lease facilities, the messages being transmitted by the lessees. With this refinement

we cannot agree. It is true that by providing his own operators the private-wire lessee receives a service that differs in some respects from that rendered to the general public. The fallacy of the argument is, however, clearly shown when it is remembered that the service rendered to the private-wire lessee corresponds very closely with that furnished by telephone companies to their subscribers * * *."

The same proceeding also involved private line telephone service of American Telephone and Telegraph Company. As to this the Commission said at pages 765-66:

"Passing now to the private-wire talking service furnished by the Bell Company, we are unable to perceive any essential differences between this and the toll service rendered the general public by that company * * *."

Likewise we see no essential difference between private wire telephone service, deemed by the I. C. C. to be a communication service, and the supplying of private wire teletypewriter service. Of the three facts stressed by the appellant here, all three would be equally applicable to the private line telephone service which is supplied by the Telephone Company and yet, there was enough control over the facilities by the Company so that the administrative body (I. C. C.) could find that a service was being rendered.

Furthermore, the appellee Telephone Company has been organized in keeping with the concept of a "service" business. It is a public service corporation in this state and as such is regulated by the Public Service Commission pursuant to Article 78, Section 2 (z) which defines a "telephone company" as:

"* * * any public service company which owns telephone lines for the reception, transmission, or communication of messages by telephone or teletype, or which lets, licenses, or sells telephonic or teletype communication."

It is significant that the determinative tests used in the above portion of the statute are: (1) the ownership of telephone lines for communication of messages by telephone or teletype, and (2) the furnishing of telephonic or teletype communication. The statute does not define a telephone company as one which "lets, licenses, or sells" *equipment,* but as one which "lets, licenses, or sells telephonic or teleptype communication." This latter definition conforms to the traditional view of the telephone business as a service.

Another approach to the solution of the question before us is to look at the contract between the Telephone Company and its subscribers for the teletypewriter facilities in order to ascertain its dominant purpose, *i.e.,* whether a service contract or a rental of equipment contract was intended, as between the contracting parties. See 35 Opinions, Atty. Gen. 285 (1950) and *United Aircraft Corp. v. O'Connor,* 107 A. 2d 398 (Conn. 1954), for analogous situations where this test was used. In the present case the dominant purpose of the parties is evidenced by the Telephone Company's tariff on file with the Maryland Public Service Commission. This tariff constitutes a public offering by the Telephone Company which, when accepted by the placing of an order by any one of the seven subscribers, created a contract embodying the terms and conditions of that tariff. In addition to characterizing the Telephone Company's private line teletypewriter communication systems as a service, in Section 29-A B 1, mentioned earlier in this opinion, the tariff further provided in 29-A:

"A 2.
"The Telephone Company will furnish private line teletypewriter and Morse service and channels when suitable facilities are available. The use of the service or channels is intended for communications in the conduct of the business of the customer and authorized users and the service will not be furnished for resale by the customer."
\* \* \*
"A 4.
"No credit is allowed for interruptions to service of less than thirty minutes. Interruptions to service

> of thirty minutes or more which are not due to the negligence of the customer, are credited to the customer at the proportionate part of the monthly contract charge in half-hour multiples for each half-hour or major fraction thereof of interruption. * * *."

Clearly, the dominant purpose as expressed in the above contract was for the Company to render a service and not for the rental of equipment. In the first place, the teletypewriters for which monthly charges have been assessed by the Comptroller as "rentals" have no utility in and of themselves. Their sole value to the customer is dependent upon his ability to communicate over channels designed, furnished, and maintained by the Telephone Company. Secondly, the customer is entitled to credit for interruptions to service which are not due to his own negligence, so as a consequence, even though the teletypewriters themselves remain in perfect working order, the customer does not have to pay if there is a breakdown in service, for any reason other than his own negligence, for thirty minutes or more in his ability to communicate.

For the reasons set forth above, we hold that Judge Cullen was correct in finding that the supplying of private line teletypewriter communication facilities by the Telephone Company constituted the rendition of a communication service and not a mere rental of communication equipment and thus monies received from such services were not taxable since they come within the purview of the Section 326 (n) exemption.

*Order affirmed, appellant to pay the costs.*