# CONDOMINIUM OWNERS 5-7 SLADE AVENUE ET AL. *v.* SUPERVISOR OF ASSESSMENTS OF BALTIMORE COUNTY

[No. 131, September Term, 1977.]

*Decided June 20, 1978.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE, ORTH and COLE, JJ.

*Edwin J. Wolf,* with whom were *Archibald Eccleston, III* and *Eccleston, Seidler & Miller* on the brief, for appellants.

*Robert J. Aumiller, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

We shall here hold that the taxing authorities and the courts which have considered this matter have erred in their interpretation of the statute formerly governing the assessment of condominiums. Thus, we shall reverse the decision of the Court of Special Appeals in an unreported opinion in this matter (No. 106, September Term, 1977, decided November 4, 1977).

The assessment is for the year July 1, 1974 — June 30, 1975. Thus, under Maryland Code (1957, 1969 Repl. Vol., 1973 Cum. Supp.) Art. 81, § 29A the date of finality was January 1, 1974. The statute in controversy is Code (1957, 1973 Repl. Vol.) Art. 21, § 11-122 (reenacted without relevant change as Code (1974) § 11-122, Real Property Article.) [1] The statute in question provides in pertinent part:

> "(a) Each property hereafter declared into a horizontal housing regime in the manner

---

[1]. The Maryland Horizontal Property Act was extensively revised by Chapter 641 of the Acts of 1974. *See* Code (1974, 1977 Cum. Supp.) §§ 11-101 to 128, inclusive, Real Property Article, § 11-114 of which refers to taxation in language substantially the same as that here under consideration. However, revision of this section by Chapter 434 of the Acts of 1977 eliminates this controversy for the future. Were it not that we learned at oral argument that there are several pending cases arising under the former statute which await our decision in this matter, we would dismiss the writ of certiorari as improvidently granted, since the case has no prospective public importance.

hereinabove set forth shall continue its original identity and unity for the purpose of evaluating the whole for assessment purposes in the manner now prescribed by law. The total evaluation thus produced shall be distributed among the condominium units into which the property was divided and the assessment of each unit shall be in direct proportion to the share and interest of each unit as established in the master deed and the declaration of the property into the regime and an individual assessment thereby placed on each condominium unit in accordance with such proportion that such unit bears to the whole property covered by the original declaration.

"(b) Each of said condominium units shall be carried on the tax records of the county . . . in which it is located as a separate and distinct entity and all real estate taxes . . . shall be assessed, levied, and collected against each of the said several, separate and distinct units in conformity with the percentages of ownership established by the declaration in the same manner and to the same extent as such assessments are levied and collected in the case of individual land parcels."

Appellants (the Owners) own condominium units located in a building at 5-7 Slade Avenue in Baltimore County. The Supervisor of Assessments of Baltimore County (the Assessor), appellee here, analyzed sales for a number of units in the condominium for a period of approximately six months between the date of creation of the condominium and the date of finality. From this sample he computed the value of the whole. It is the contention of the Owners that the Assessor and the courts which have since reviewed the matter failed to give effect to the statutory language which they say requires valuation of the whole. We agree.

The Owners were unsuccessful before the Maryland Tax Court, the Circuit Court for Baltimore County, and the Court of Special Appeals. Code (1957, 1975 Repl. Vol., 1977 Cum.

Supp.) Art. 81, § 229 (o) provides that review by a circuit court of a decision of the tax court shall be upon the record made in the tax court, and that the latter's order shall be affirmed "if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record."

The Owners rely heavily upon our decision in *Supervisor v. Southgate Harbor,* 279 Md. 586, 369 A. 2d 1053 (1977). The taxpayers there contended that it was discriminatory error for the assessor to use a square foot basis of valuation of the land of the condominiums when a front foot basis was used for certain other land in the Annapolis area. They seized upon the language in Art. 21, § 11-122 (b) to the effect that "condominium units shall be carried on the tax records of the county . . . as a separate and distinct entity and all real estate taxes . . . shall be assessed . . . and collected against each of the said . . . units . . . in the same manner . . . as such assessments are levied and collected in the case of individual land parcels." From this it was argued that if other waterfront land in the Annapolis area were assessed on a front foot basis, then their land must also be so assessed. Citing *Thomas v. State,* 277 Md. 314, 317, 353 A. 2d 256 (1976), together with the cases referred to in *Thomas,* we spoke in *Southgate Harbor* of the hornbook rule of statutory construction to which this Court has alluded many times: In ascertaining the intention of the General Assembly, all parts of a statute are to be read together to find the intention as to any one part, and all parts are to be reconciled and harmonized if possible. A corollary to that rule is that if there is no clear indication to the contrary, and it is reasonably possible, a statute is to be read so that no word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless, or nugatory. We noted that the term "property" as used in § 11-122 is defined in § 11-101 (m) as "mean[ing] and includ[ing] the land, whether leasehold or in fee simple, the building or buildings, all improvements and structures thereon, and all easements, rights and appurtenances thereunto belonging." We further noted that the language of a statute must be considered in its natural and ordinary signification, citing *Bartell v. Bartell,* 278 Md.

12, 17, 357 A. 2d 343 (1976), and *St. Paul Fire & Mar. v. Ins. Comm'r,* 275 Md. 130, 139, 339 A. 2d 291 (1975). We then said:

"Thus, we read the command here as one that a property brought 'into a horizontal housing regime' shall first be evaluated as a whole in the same manner in which it would be evaluated were it not under the Horizontal Property Act. After this has been done the value thus established is to be divided among the various units in the proportion established by the deed. Then under subsection (b) the assessed value for each of those units is to be carried on the tax records and taxes are to be collected from their owners based on those assessments in the same way in which taxes would be collected from the owner of a property not under the Horizontal Property Act based on the existing assessment for that property. Accordingly, the phrase 'in the same manner and to the same extent' in subsection (b) does not mandate that any given method of valuing a property must be used for all land in a given area." 279 Md. at 591.

It will be noted that in *Southgate Harbor* we were primarily concerned with interpreting the language used in § 11-122 (b). However, what we said concerning § 11-122 (a) has relevance to this controversy.

William Kerr, in *Condominium — Statutory Implementation,* 38 St. John's L. Rev. 1 (1963), opens his discussion by saying, "The term 'condominium' was practically unknown in this country until 1960 when residents of Puerto Rico sought an amendment to the National Housing Act authorizing Federal Housing Administration insurance of mortgages on individual apartments or units in multi-unit buildings." The model statute for such ownership was promulgated by the Federal Housing Administration. *See* 1A P. Rohan & M. Reskin, *Condominium Law & Practice,* Appendix B-3 (1965). Kerr comments, at 2, in explaining the condominium concept, "The undivided ownership is in a fixed ratio, generally that which the value of the apartment bears

to the value of the entire property at the time the condominium is established." He further states on the subject of real estate taxes:

"It is important economically that the method employed in assessing apartments will not result in a higher aggregate assessed value of the property than would result from the assessment of the property as a whole. If the condominium is exploited to get more assessed valuation out of apartment buildings than would otherwise be obtainable, the economic advantage of condominium ownership over renting may be largely lost.

"In Puerto Rico the property is in practice valued as an entirety and the assessed valuations of the apartments are arrived at by applying against the over-all valuation the percentage of each owner's interest in the common elements. This appears to be not only simple but fair to the apartment owners and the taxpaying public. It should help to minimize any increase in the cost of operating an assessor's office which might otherwise be caused by the creation of condominiums." *Id.* at 38.

The master deed necessary for the creation of a condominium at the time here pertinent was required by Art. 21, § 11-109 (d) to express the "[v]alue of the property and of each unit, and, according to these basic values, the percentage appertaining to the co-owners in the expenses of and rights in the elements held in common." Thus, the Maryland provision did not differ markedly from Ill. Rev. Stat. 1969, ch. 30, § 304 (c), specifying that there be expressed in such a deed:

"The percentage of ownership interest in the common elements allocated to each unit. Such percentages shall be computed by taking as a basis the value of each unit in relation to the value of the property as a whole, and having once been determined and set forth as herein provided, such

percentages shall remain constant unless thereafter changed by agreement of all unit owners."

Ill. Rev. Stat. ch. 30, § 310 provides that "[r]eal property taxes ... shall be assessed against and levied upon each unit and the owner's corresponding percentage of ownership in the common elements as a tract, and not upon the property as a whole." Accordingly, the discussion in Kane & Helms, *The Illinois Condominium Property Act,* 1970 U. Ill. L. F. 157 (1970), as to assessment for real estate tax purposes is of interest:

"It would seem that the most practical method of assessing a condominium for real estate tax purposes would be for the local assessor to determine a value for the land and a value for all improvements as is now done for all other multi-unit rental or co-op buildings. The total valuation for the land and improvements should then be allocated among the unit ownerships in a condominium according to each unit's percentage interest in the common elements as stated in the declaration. Since each unit's percentage interest in the common elements is determined on a value ratio basis, the real estate tax assessment of a condominium should logically be allocated among the unit ownerships in the same manner. However, it is not clear what should happen when certain unit owners make major improvements to their respective units which result in a substantial variation in the respective fair market values of the units compared to their respective percentages of ownership interest as stated in the declaration. It could be argued in such a situation that the local assessor should not strictly follow the percentages of ownership interest and that he should make an independent valuation of each unit ownership. Even though the Illinois Act requires the unanimous agreement of all unit owners to change the percentages of ownership interest, it could also be argued that when such percentages become substantially at variance with

the respective values of the units, the real burden is on the unit owners to change those percentages by amending the declaration." *Id.* at 172 (footnotes omitted).

We are of the view that the plain language of the statute mandates the interpretation placed upon it by the Owners. If we had any doubt on that subject, this doubt would be dispelled by the legislative history available as to the statute which replaced it, providing for valuation of each individual unit, thus changing the law. The 1976 Report to the General Assembly of Maryland by the House Ways and Means Committee states at 515 the committee recommendation "that the valuation of condominium properties based upon assigned percentages of ownership should be subject to review by the assessors and that improvements to individual units should be assessed to those units alone," followed by the comment, "Legislation to accomplish these objectives is attached." The attachment proposed an amendment to § 11-114 striking out former language and inserting "for purposes of that assessment each property shall be assessed in accordance with the provisions of Article 81 Section 14 (B), except that common elements shall be assessed in the percentage interest recorded in the master deed." It would appear that this proposal is the source from whence came Code (1974, 1977 Cum. Supp.) § 11-114 Real Property Article, as most recently amended by Chapter 434 of the Acts of 1977, which now provides in pertinent part:

"(a) Each condominium unit and its appurtenant undivided interest in the common elements shall be assessed at full cash value on the date of finality as provided in Article 81, § 14 of the Code. Each unit shall be carried on the tax records of the county where it is located as a separate and distinct entity; and all real estate taxes ... coming due after the establishment of the condominium regime, shall be assessed, levied, and collected against each unit in the same manner and to the same extent as assessments are levied and collected in the case of individual land parcels."

The Assessor, citing *Swarthmore Co. v. Kaestner,* 258 Md. 517, 266 A. 2d 341 (1970), and *Dept. of Tide. Fisheries v. Sollers,* 201 Md. 603, 95 A. 2d 306 (1953), for the proposition "that where reasonable, statutes should be construed so as to uphold their constitutionality since it is presumed that the Legislature does not intend to enact ineffective or invalid laws," mounts two constitutional attacks upon the Owner's construction.

The Assessor calls attention to *Rogan v. Commrs. of Calvert County,* 194 Md. 299, 71 A. 2d 47 (1950), where our predecessors said:

> "The purpose of the equal protection clause of the Fourteenth Amendment of the Constitution of the United States is to protect every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by the provisions of a statute or by improper enforcement of a statute. *Intentional and systematic undervaluation by assessors of other taxable property in the same class violates the constitutional right of a person taxed upon the full value of his property.* However, mere errors of judgment on the part of State or County officials in making assessments will not support a claim of such discrimination. *There must be something which in effect amounts to an intentional violation of the essential principle of practical uniformity.* The good faith of such officials and the validity of their actions will be presumed. When their actions are assailed, the burden of proof is upon the complaining party. *Sunday Lake Iron Co. v. Township of Wakefield,* 247 U. S. 350, 38 S. Ct. 495, 62 L. Ed. 1154 [(1918)]; *Sioux City Bridge Co. v. Dakota County, Nebraska,* 260 U. S. 441, 43 S. Ct. 190, 67 L. Ed. 340, 28 A.L.R. 979 [(1923)]." *Id.* at 309-10 (emphasis supplied by the Assessor).

It is suggested that the failure in the assessment process to determine the value of these units based upon each individual unit's sale price, or the sale price of similar units, would

constitute intentional and systematic undervaluation and thus would amount to a denial of equal protection to other taxpayers.

In *Adm'r, Motor Veh. Adm. v. Vogt,* 267 Md. 660, 299 A. 2d 1 (1973), Judge Levine said for the Court:

> "That the 'traditional' or 'fundamental' standard [for judicial review,] enunciated in *Lindsley* [*v. Natural Carbonic Gas Co.,* 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369 (1911)], applies where tax statutes are challenged on equal protection grounds is clear. *Walters v. City of St. Louis, Mo.,* 347 U. S. 231, 74 S. Ct. 505, 98 L. Ed. 660 (1954); *Hooks v. Comptroller,* 265 Md. 380, 289 A. 2d 332 (1972); *Fair Lanes, Inc. v. Comptroller,* 265 Md. 361, 289 A. 2d 595 (1972). In *Fair Lanes,* where we quoted extensively from *Walters,* Judge Barnes, speaking for the Court, said:
>
>> 'The trend in the opinions of the Supreme Court of the United States ... has been toward sustaining the power of the States to make valid classifications for purposes of taxation against attacks based upon the Fourteenth Amendment prohibition of a denial of equal protection of the laws. (citations omitted)' 265 Md. at 367.
>
> "In *Hooks,* following our prior decisions and those of the Supreme Court, Judge Singley said for the Court:
>
>> 'It has long been recognized that taxation is a practical affair, *Frank J. Klein v. Comptroller,* 233 Md. 490, 494, 197 A. 2d 243 (1964), and that "only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes" can the presumption of constitutionality be rebutted. . . .' 265 Md. at 388."

*Id.* at 674.

The standards enunciated by the Supreme Court in *Lindsley v. Natural Carbonic Gas Co.*, 220 U. S. 61, 31 S. Ct. 337, 55 L. Ed. 369 (1911), were:

> "The rules by which this contention must be tested, as is shown by repeated decisions of this court, are these: 1. The equal protection clause of the Fourteenth Amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a *wide scope of discretion* in that regard, and avoids what is done only when it is without *any* reasonable basis and therefore is purely arbitrary. 2. A classification having *some* reasonable basis does not offend against that clause merely because it is not made with mathematical nicety or because in practice it results in *some* inequality. 3. When the classification in such a law is called in question, *if any state of facts reasonably can be conceived* that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. 4. One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary." 220 U. S. at 78-79 (All emphasis added. Citations omitted.)

In *Walters v. City of St. Louis, Mo.,* 347 U. S. 231, 237, 74 S. Ct. 505, 98 L. Ed. 660 (1954), cited by Judge Levine for the Court in *Vogt,* the Supreme Court said, "Equal protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary." *See also Montgomery County v. Fields Road Corporation,* 282 Md. 575, 386 A. 2d 344 (1978).

It is apparent that those involved elsewhere in setting values on buildings containing condominium units have deemed it fair to compare those buildings to similar buildings

in the area not subdivided into such units. A rational basis for the classification exists, as may be gleaned from an examination of the article by Kerr: By the device of creating condominiums, those who might otherwise be renters are converted into homeowners. *See* Kerr, *supra,* 38 St. John's L. Rev. at 11, asserting, "Owning eliminates the landlord's profit as a component of the cost of shelter." It will be recalled that Kerr observed at 38, "If the condominium is exploited to get more assessed valuation out of apartment buildings than would otherwise be obtainable, the economic advantage of condominium ownership over renting may be largely lost." Over the period of the last 40 to 45 years there have been multitudinous governmental programs aimed at encouraging individual home ownership. Moreover, the conversion of a given building from single ownership to one with a large number of owners as in the case at bar does not necessarily automatically effect a transformation by which the market value of the parts suddenly exceeds the value of the whole. Instances have been known, for example, in which in an effort to obtain the best possible price canning factories have been offered for sale as operating units, the bids reserved, and then the property offered separately by the piece at the same sale (land offered separately and each piece of equipment offered separately), with a higher price sometimes generated in the sale as a whole and other times obtained in a sale by the piece. Given the presumption of constitutional validity of statutes, and the burden placed upon one who assails a classification in an act to show that it does not rest upon any reasonable basis but rather is essentially arbitrary, we hold that the Assessor has not met his burden in this instance.

The second constitutional attack stems from the contention of the Owners that the supervisor should "carry over the previous year's assessment," it being argued that this fails to recognize the mandate of uniformity of taxation set forth in Maryland Declaration of Rights, Art. 15, and required under the equal protection clause of the Fourteenth Amendment to the Constitution of 'the United States. We deem it unnecessary to address this constitutional contention since

the clear requirement of Code (1957, 1969 Repl. Vol., 1973 Cum. Supp.) Art. 81, § 14 (b) (1) (applicable to this proceeding) is that real property "shall be assessed at the full cash value thereof on the date of finality." What was determined as the proper assessment on the prior year's date of finality does not necessarily represent the value on a subsequent year's date of finality. If it did, it would not be necessary to have an annual review of assessments. It follows, therefore, that the tax court must determine the actual cash value of the property in question as of the date of finality, using as its guide the statute as we have interpreted it.

> *Judgment reversed and case remanded to the Court of Special Appeals for passage of an order reversing the judgment of the Circuit Court for Baltimore County and directing that court to remand the case to the Maryland Tax Court for further proceedings consistent with this opinion; appellee to pay the costs.*