# QUOTRON SYSTEMS, INC. *v.* COMPTROLLER OF THE TREASURY

[No. 20, September Term, 1979.]

*Decided February 25, 1980.*

*Motion for reconsideration filed March 21, 1980; denied April 1, 1980.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*Julian I. Jacobs,* with whom were *David P. Gordon, Eugene M. Feinblatt* and *Gordon, Feinblatt, Rothman, Hoffberger & Hollander* on the brief, for appellant.

*Amicus curiae* brief filed by Bunker Ramo Corporation, *E. Stephen Derby, Lawrence M. Katz, Joseph H. Langhirt* and *Piper & Marbury* on the brief.

*Paul S. Sugar, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

DAVIDSON, J., delivered the opinion of the Court. MURPHY, C. J., dissents and filed a dissenting opinion at page 189 *infra.*

This case involves an application of the Maryland Use Tax. Md. Code (1957, 1975 Repl. Vol.), Art. 81, §§ 372-401.

Maryland Code (1957, 1975 Repl. Vol., 1979 Cum. Supp.), Art. 81, § 373 (a) provides in pertinent part:

> "An excise tax is hereby levied and imposed on the use . . . of tangible personal property and certain services purchased within or without this State. . . ."

Maryland Code (1957, 1975 Repl. Vol., 1979 Cum. Supp.), Art. 81, § 372 (d) provides in pertinent part:

> " 'Use' means the exercise . . . of any right or power over tangible personal property purchased either within or without this State. . . ."

Maryland Code (1957, 1975 Repl. Vol.), Art. 81, § 372 (f) provides in pertinent part:

> " 'Purchase' means the acquisition for a price . . . of . . . tangible personal property. . . . A transaction shall be deemed to be a purchase if the acquisition . . . was effected by:
>
> (1) The transfer . . . of title or possession . . . of the tangible personal property.
>
> (2) A lease, rental or grant of a license to use . . . the tangible personal property."

The question here is whether a company which provides information services, and which makes available to its subscribers computer hardware upon which to receive those services, is subject to a Maryland use tax on that part of its monthly charges which is attributable to the use of that hardware.

The appellant, Quotron Systems, Inc. (Quotron), provides to its subscribers a variety of financial information services, including displays of the New York and American stock exchange tickers, prices and sales of selected securities, and headlines or news stories from various wire services. It sends this information over leased telephone and telegraph lines from its computer in New York. Subscribers receive the information on hardware consisting of a computer, keyboards and display screens which Quotron provides to its

subscribers. The cost of the hardware is approximately 20 percent of the costs incurred by Quotron in providing the information services. In Maryland, a subscriber cannot receive Quotron's financial information services without utilizing Quotron's hardware, nor can it utilize Quotron's hardware without subscribing to the information services. While it is possible for a subscriber which has been provided with Quotron's hardware to utilize that hardware to "access" its own data base, there is no evidence to show that any Maryland subscriber has so utilized Quotron's hardware.

All of the hardware provided is owned, installed, maintained, repaired, relocated, and insured by Quotron. Although Quotron installs the hardware at locations designated by the subscriber, the computer is kept locked, usually in a locked room, and the subscriber is not permitted any access to it.

Quotron's monthly charges are comprised of three elements. Each subscriber pays a uniform "basic service charge." In addition, there is a separately stated charge for each type of information service the subscriber elects to receive.[1] Finally, there is a separately stated charge for each additional keyboard or display screen needed for the most effective utilization of the information services.[2] These three charges must equal at least a minimum amount. While the contract between Quotron and its subscribers provides that Quotron "shall have no liability . . . for interruptions of the service," Quotron in fact provides a credit for any such interruptions.

Between 1973 and 1977, Quotron paid a use tax on the cost of the hardware at the time it was installed on the subscribers' premises. It did not pay a use tax on any part of its monthly charges.

On 15 August 1977, the appellee, the Comptroller of the Treasury (Comptroller), assessed Quotron for a use tax, interest, and penalty on all monthly charges collected

---

[1]. Each subscriber receives the "Quotron 800 Quotation Service" for which there is no separately stated charge.

[2]. The separately stated charge for keyboards and display screens does not reflect, according to testimony, their value.

between 1 July 1973 and 1 June 1977. On 9 December 1977, a hearing examiner found that although Quotron was engaged in the business of providing information services, its transfer of hardware constituted a lease, and therefore Quotron's monthly charges represented rentals of tangible personal property which were taxable under Art. 81, § 372 (f) (2). On 26 October 1978, the Maryland Tax Court found that the charges did not constitute rentals from leases of hardware. It determined that because the transfer of hardware was necessary yet nevertheless incidental to the provision of Quotron's information services, such a transfer did not constitute a lease. Quotron's monthly charges, therefore, represented charges for services which, in the absence of an express applicable statutory exemption, were taxable under Art. 81, § 373. On 1 February 1979, the Baltimore City Court affirmed. On 12 February 1979, Quotron appealed to the Court of Special Appeals. We issued a writ of certiorari before consideration by that Court. We shall reverse.

Here, the Comptroller concedes[3] that under Art. 81, § 373, the State has no right to collect a use tax on services. He contends that Quotron provides both a service and hardware. He maintains that when Quotron places the hardware in the subscribers' offices, it has either transferred possession of or leased tangible personal property to its subscribers, and is therefore subject to a use tax on the value of that property. He maintains that the value of the hardware consists of all of the monthly charges other than those for optional information services.

Quotron, however, contends that it provides only information services. It points out that it is necessary to place its hardware in its subscribers' offices in order to provide those services. It insists that the provision of the hardware is necessary yet nevertheless incidental to the provision of the services and, therefore, that Quotron itself, and not the subscribers, is using the hardware. It concludes that under these circumstances, no part of its monthly

---

3. This concession was made during oral argument.

charges to subscribers is taxable, but rather that it, not the subscribers, must pay a use tax on the cost of the hardware.

In *Comptroller of the Treasury v. Chesapeake & Potomac Telephone Co.,* 241 Md. 345, 216 A.2d 717 (1966), this Court considered the question whether the C & P Telephone Company, which furnished both teletypewriter equipment and services to its subscribers, was providing a telecommunication service or renting tangible personal property. There, the Comptroller claimed that the monthly charge collected by C & P represented rentals for the lease of the equipment which was tangible personal property. C & P contended that it provided only communication services.

The record showed that the sole function of the equipment was to transmit and receive communications and that it had no utility in and of itself. The equipment was located on the premises of the subscribers who provided operators to send and receive messages by depressing the appropriate keys on the equipment. Although the equipment could be used at the subscribers' discretion, it could be used only to send and receive messages between specified locations. C & P could not intentionally interrupt the transmission of a message.

Although the subscribers exercised some control over the equipment, C & P retained ownership of it. In addition, C & P owned the channels of communication consisting of the connecting wires, cables, and lines which it furnished to its subscribers. It determined when and where to install, maintain, repair, replace, and relocate both the instruments and the connecting wires, cables, and lines. Only C & P could install or maintain the equipment and the communication channels.

The record further showed that the contract between the parties did not provide for the rental of equipment. While language in bills indicated that some of the charges were for "Rental Teletypewriter Facilities," there was testimony to show that this language was merely a colloquialism "often used to describe situations that are not rentals at all." The contract expressly characterized C & P's activities as a service, and provided that if there was an unintentional,

substantial interruption of that service, the subscribers were to be given a credit. Based upon these facts, this Court found that C & P retained control of the equipment, and that the dominant purpose of the contract was to provide a service. It determined, therefore, that C & P provided a service and not a mere rental of equipment, and held that the charges received from the rendition of such communication services were not taxable because of an exemption expressed in Art. 81, § 326 (n).[4]

In reaching this conclusion, this Court first determined that, although C & P provided both teletypewriter equipment and services, it was necessary to characterize those activities as a single, overall function which was either a rental of equipment or the provision of services. Having characterized the overall function as a service, the Court next considered whether that function was subject to a sales tax. Thus this case establishes that in order to determine whether a sales tax can be imposed when a company provides both a service and related equipment, a two-step analysis must be employed. First, the overall function must be characterized by the examination of various factors as either a rental or transfer of possession, or a service. Secondly, it must be determined whether that function is subject to a sales tax. In other jurisdictions in which the same or similar questions have been considered, the same

---

4. Md. Code (1957, 1965 Repl. Vol.), Art. 81, § 326 (n) provided in pertinent part:

"The tax hereby levied shall not apply to the following sales:

. . .

(n) Transportation and communication services and newspapers. — Sales of transportation and communication services. . . ."

Md. Code (1957, 1975 Repl. Vol., 1979 Cum. Supp.), Art. 81, § 326 (bb) now provides in pertinent part:

"The tax hereby levied does not apply to the following sales:

. . .

(bb) Communication services. — Charges for communication services made by a person whose charges . . . are . . . subject to the federal excise tax. . . ."

analysis has been employed. *Askew v. Bell,* 248 So. 2d 501, 501 (Fla. Dist. Ct. App. 1971); *Spagat v. Mahin,* 50 Ill. 2d 183, 189, 277 N.E.2d 834, 837-38 (1971); *J. H. Walters & Co. v. Department of Revenue,* 44 Ill. 2d 95, 101-102, 254 N.E.2d 485, 490 (1969); *Community Telecasting Serv. v. Johnson,* 220 A.2d 500, 503 (Me. 1966); *Dun & Bradstreet v. City of New York,* 276 N.Y. 198, 205, 11 N.E.2d 728, 731 (1937). *See also Undercofler v. Grantham Transfer Co.,* 114 Ga. App. 868, 869-70, 152 S.E.2d 900, 902-903 (1966); *Machinery Moving Inc. v. Porterfield,* 26 Ohio St. 2d 99, 102, 269 N.E.2d 418, 419 (1971).

In *C & P,* the Court expressly relied upon two standards, the control of the equipment and the dominant purpose of the contract, in characterizing C & P's single, overall function as a service. The Court, however, also took into account the relationship between the equipment and the service when it found that the sole function of the equipment was to transmit and receive communications and that it had no utility in and of itself. Courts in other jurisdictions which similarly have examined the relationship between equipment and services in characterizing an overall function, have applied a third standard. *J. H. Walters & Co.,* 44 Ill. 2d at 104-05, 254 N.E.2d at 491; *Community Telecasting Serv.,* 220 A.2d at 503; *Dun & Bradstreet,* 276 N.Y. at 205, 11 N.E.2d at 731. This standard was expressed by the Supreme Court of Illinois in *Snite v. Department of Revenue,* 398 Ill. 41, 46, 74 N.E.2d 877, 879-80 (1947), as follows:

> "If the article sold has no value to the purchaser except as a result of services rendered by the vendor and the transfer of the article to the purchaser is an actual and necessary part of the service rendered, then the vendor is engaged in the business of rendering service and not in the business of selling at retail. If the article sold is the substance of the transaction and the service rendered is merely incidental to and an inseparable part of the transfer to the purchaser of the article sold, then the vendor is engaged in the business of selling at retail, and

the tax which he pays for the privilege of engaging in such business is measured by the price which the purchaser pays for the article and the service incident thereto."

In our view, this standard, like the standards of the control of the equipment and the dominant purpose of the contract, is applicable when characterizing the overall function of a company which provides both a service and related equipment.

Because Quotron provides both a service and related hardware, the analysis employed in *C & P* is appropriate here despite the fact that the *C & P* case involved a sales tax and an alleged rental, whereas this case involves a use tax and either an alleged rental or other type of transfer of possession. The sales and use taxes are complementary so that if a transaction is not subject to the sales tax, it is not subject to the use tax. *Comptroller of the Treasury v. Glenn L. Martin Co.,* 216 Md. 235, 242, 140 A.2d 288, 291, *cert. denied,* 358 U.S. 820, 79 S. Ct. 34 (1958); *Comptroller of Treasury v. Crofton Co.,* 198 Md. 398, 400, 84 A.2d 86, 87 (1951). *See Montgomery County v. Maryland Soft Drink Ass'n,* 281 Md. 116, 123, n. 3, 377 A.2d 486, 490, n. 3 (1977). Moreover, control is the critical factor in determining whether any type of transfer of possession, including a lease, has occurred.[5] Under these circumstances, the principles established by C & P are applicable here.

---

**5.** Where a word is used in a statute and not specifically defined, it should be construed as having its ordinary and commonly accepted meaning. Wheeler v. State, 281 Md. 593, 596-97, 380 A.2d 1052, 1054-55, 1977, *cert. denied,* 435 U.S. 997, 98 S. Ct. 1650 (1978); Allen v. Mutual Fire Ins. Co., 2 Md. 111, 120-21 (1852).

Black's Law Dictionary 1325 (4th ed. 1951) defines "possession" as:

"The detention and *control* . . . of anything which may be the subject of property, for one's use and enjoyment. . . ." (Emphasis added.)

Webster's Third New International Dictionary, Unabridged 1770 (1971) defines "possession" as:

"[T]he act or condition of having in or taking into one's *control.* . . ." (Emphasis added.)

Applying these principles to the instant case produces a clear result. Here the record shows that although Quotron's hardware could be used to "access" the subscribers' own data bases, the sole function of the hardware provided to Maryland subscribers was to receive financial information services provided by Quotron. Thus the hardware had no utility in and of itself to Maryland subscribers.

The hardware was placed on the subscribers' premises at locations designated by them. While the subscribers provided operators to "access" the information by depressing appropriate keys on the keyboards, the computer itself was kept locked and the subscribers had no access to it. Although the hardware could be used at the subscribers' discretion, it could be used only to receive information services provided by Quotron.

Although the subscribers exercised some control over the hardware furnished by Quotron, Quotron retained ownership of it. In addition, Quotron itself rented the channels of communication which it in turn furnished to its subscribers. Quotron installed, maintained, repaired, replaced, relocated, and insured the hardware at its own expense, except under specified, limited circumstances. Most significantly, Quotron paid a use tax on the value of the hardware at the time it placed it in its Maryland subscribers' offices.

The record further shows that the contract between Quotron and its subscribers did not provide for the rental of hardware. There was language in the contract and bills to indicate that there were some separately stated charges for keyboards and display units. Unlike the teletypewriter charges referred to in the *C & P* case, these charges were not characterized as "rentals," and there was testimony to show that they did not, in fact, reflect the value of that hardware.

*See also* COMAR .03.06.0173E which provides in pertinent part:

"In order to constitute a taxable transaction, possession of the property must be transferred to the lessee. Possession shall be deemed to have passed to the lessee whenever the property is under his *control* or direction. . . ."

The contract repeatedly characterized Quotron's activities as a service, and while it provided that Quotron would not incur any liability for interruptions of service, there was testimony to show that credit was in fact given for such interruptions.

Finally, the record shows that the service provided by Quotron required the use of hardware which had no utility in and of itself to Maryland subscribers. In fact, it was not possible to obtain the hardware without subscribing to the information services nor was it possible to receive only the services. In addition, the record shows that the cost of the hardware represented only 20 percent of the total costs incurred by Quotron in providing its information services.

Here there is evidence to show that on balance Quotron retained control of the hardware. Moreover, the language of the contract itself establishes that the dominant purpose intended by the parties was to render a service and not to rent hardware. Finally, it is clear that the hardware itself is a necessary yet nevertheless incidental part of Quotron's overall function which is to provide information services. Thus Quotron's control of the hardware, the dominant purpose of the contract, and the relationship between the hardware and the service, all support the conclusion that Quotron's overall function should be characterized as the provision of services, and not as the mere rental or transfer of possession of hardware. The Maryland Tax Court's finding that Quotron was providing a service was supported by substantial evidence. *See Condominium Owners v. Supervisor of Assessments,* 283 Md. 29, 32, 388 A.2d 116, 117 (1978).

The only remaining question is whether this service is subject to a use tax. The Maryland Tax Court determined that in the absence of an express, applicable statutory exemption, the service was taxable. In this Court, however, the Comptroller has conceded that the State has no right to collect a use tax on services.[6] Under this circumstance, we

---

6. Given this concession, we need not decide whether Art. 81, § 373, which provides that a use tax is levied on "certain services," is too vague to permit the State to collect a use tax on services. Neither do we need to

hold that Quotron is not subject to a use tax on any part of its monthly charges to subscribers.[7] Accordingly, we shall reverse.

*Judgment reversed.*
*Costs to be paid by appellee.*

*Murphy, C. J., dissenting:*

The Court holds that the Comptroller's assessment of a use tax upon the full amount of the "monthly charge" made by Quotron to its Maryland subscribers was in error. It concludes that no part of that charge is subject to the tax, thus reversing the judgment of the Baltimore City Court, which upheld the Tax Court's affirmance of the Comptroller's assessment. I dissent from that conclusion and give my reasons.

Quotron provides to its subscribers information services and computer hardware upon which to receive the services. At issue is the extent to which the transactions between Quotron and its subscribers are subject to the Maryland Use Tax. Maryland Code (1957, 1975 Repl. Vol., 1979 Cum. Supp.), Art. 81, §§ 372-402.

Quotron offers its subscribers about fifty types of information services, including displays of stock exchange tickers, prices and sales of certain securities, and headlines of news stories from various wire services. Quotron's information service originates in New York City, where information is continuously received and programed into computers. Information stored in these computers is transmitted to Maryland subscribers over leased telephone

---

decide whether the services which Quotron provides are exempt under applicable law or whether a tax on such services would violate the Commerce Clause of the United States Constitution, Art. I, § 8, cl. 3.

7. We note that Quotron has conceded that it must pay a use tax on the hardware it uses to provide its financial information services. The question which arose during oral argument of whether this tax should be paid in a lump sum at the time Quotron installed the hardware on its subscribers' premises, or should be paid in monthly installments, is not before us and need not be decided here. Md. Rules 813 (b) (1) and 885.

and telegraph lines via a regional computer center in Philadelphia. The regional computer stores and retransmits the information to a computer hardware system provided by Quotron and installed in individual subscribers' offices. Consisting of a communications computer, keyboards and display units, the computer hardware system gives the subscriber access to the information services. Through operation of the keyboard, the information stored in the New York or Philadelphia data base is transmitted to the subscriber's office computer which processes the transmitted information for observation on the subscriber's display units.

The cost of the hardware is about twenty percent of the costs incurred by Quotron in providing the information services. Although a subscriber may use Quotron's hardware to obtain access to its own private data base, no evidence in this case established such a use. All of the hardware provided to subscribers is owned, installed, maintained and insured by Quotron. Subscribers are contractually bound to pay Quotron a "monthly charge." Encompassed within this charge are three elements. Each subscriber pays a uniform "basic service charge"; in addition, there is a separate charge for each type of information service received, and a separate charge for additional keyboards or display screens.

Section 373 of the use tax statute imposes an excise tax on

"the use, storage or consumption in this State of tangible personal property and certain services *purchased* within or without this State ...." (Emphasis supplied.)

Section 372 (d) defines " '*Use*' " to mean

"the exercise by any person within this State of any right or power over tangible personal property *purchased* either within or without this State ...." (Emphasis supplied.)

Under the preceding two provisions, it is evident that a

"purchase" is a prerequisite to imposition of a use tax. The term " '*Purchase*' " is defined in § 372 (f) to mean

> "the acquisition *for a price* by any person *of taxable services or tangible personal property* which is used, stored or consumed within this State. A transaction shall be deemed to be a purchase if the acquisition of tangible personal property was effected by:
>
> (1) The transfer, either conditionally or absolutely, of title or *possession* or both of the tangible personal property.
>
> (2) A lease, rental or grant of a license to use (including royalty agreements), store or consume the tangible personal property." (Emphasis supplied.)

The tax imposed is calculated upon the "price" charged for the "purchase." [1] The term " '*Price*' " is defined in § 372 (g) to mean

> "the aggregate value in money of any thing or things paid or delivered, or promised to be paid or delivered by a purchaser to a vendor in the consummation and complete performance of a *retail sale* without any deduction therefrom on account of the cost of the property sold, cost of materials used, labor or service cost, or any other expense whatsoever. 'Price' shall be deemed to be the amount received exclusive of the tax hereby imposed provided the vendor shall establish to the satisfaction of the Comptroller that the tax was added to the price. . . ."

Section 372 (h) defines a " '*Retail sale*' " to mean

> "all sales in any quantity or quantities of tangible personal property, or services taxable under this subtitle, within or without this State."

---

1. The rate of tax is currently 5%.

Section 376 imposes responsibility upon Quotron as a vendor making sales of tangible personal property or services subject to the use tax to collect the tax from the purchaser; should the vendor fail to do so, § 380 provides that it will be personally liable for the payment of the taxes due.

The Comptroller assessed the use tax on the full amount of Quotron's "monthly charge" on the theory that Quotron engaged in a taxable transaction where, for a "price," it transferred possession of tangible personal property to its subscribers. He maintained that the information service was an integral part of the transaction pursuant to which the computer hardware was transferred to Quotron's subscribers; and that consequently the full amount of the monthly charge, including that part allocable to the receipt of information services, was taxable since the statutory definition of "price" prohibited a deduction of service cost from the charge for the property.

The Tax Court concluded that the entire monthly charge was subject to the use tax. It found that Quotron's primary purpose was to provide a financial information service, and said it was "a service which is being taxed in this case." It held, however, that the transfer of possession of the computer hardware to Quotron's subscribers subjected the transaction to a use tax on the amount of the monthly charge because the equipment was so indispensable to the service function that it was impracticable to carry out that function without the transfer of the property.

The Baltimore City Court (Kaplan, J.) affirmed the assessment on appeal, stating that the tax was properly levied "on the equipment leased to Quotron's subscribers." It accepted the Comptroller's argument that Quotron's information service was not being taxed by and of itself, but rather the tax was based on the transfer of possession of the equipment to Quotron's subscribers. What was being taxed, the court said, was the transfer of tangible personal property, and if the service was also being taxed, it was because it was part of the "price" of the property transferred. The court concluded:

> "Quotron should have paid a use tax on the fees it collected for equipment transferred to the

subscribers of its information service. The subscribers have possession of the equipment, since they can use it whenever they wish and it is located at their premises, rather than at the premises of the Company. The equipment is an integral element of the entire operation, and a tax on its use is within the ambit of the statute providing for a tax on the use of tangible personal property."

It is undisputed that Quotron has paid on its own behalf a Maryland use tax on the value of all computer hardware which it has brought into the State. It has done so on the theory that it, rather than its subscribers, uses the equipment as the means by which it communicates its information services. It suggests that the equipment is of no utility to subscribers in and of itself, since their only concern is to obtain information. It argues that no additional use tax should be collected on the amount of the monthly charge paid by its subscribers for several reasons. First, it contends that a use tax on the monthly charge would be a tax on a service, and that the term "certain services" in § 373 is so vague as to prevent imposition of a use tax on any service. This argument is based on the fact that § 373 fails to specifically describe or enumerate the types of services that are taxable. Quotron further asserts that nothing else in the use tax subtitle aids in determining the services subject to the use tax. According to Quotron, § 373 creates a doubt as to whether the service it renders is subject to the use tax, and that when doubt exists, a tax statute must be construed against the State. *See Comptroller v. Mandel Re-election Com.,* 280 Md. 575, 580, 374 A.2d 1130 (1977); *Fair Lanes v. Comptroller,* 239 Md. 157, 162, 210 A.2d 821 (1965).

Quotron also argues that to subject tangible personal property or services to the Maryland use tax there must be a "purchase." To constitute a purchase, Quotron maintains that there must be an acquisition for a "price" of tangible personal property, either by a sale, a lease or a rental, or by the delivery of title to the equipment. Quotron argues that its transactions with its subscribers involve none of these elements and consequently no part of the monthly charge is

taxable. It contends further that it does not transfer possession of computer hardware to its subscribers within the contemplation of the use tax statute, or the Comptroller's regulations because it does not relinquish control over the equipment.

At oral argument, counsel for the Comptroller appeared to concede that a use tax cannot be collected on the purchase of a service per se. Seizing upon this concession, and applying the "dominant purpose" test articulated in *Comptroller v. C & P Tel.,* 241 Md. 345, 216 A.2d 717 (1966), the majority has concluded that the essence of the agreement between Quotron and its subscribers was to render a service and, therefore, no part of the monthly charge, even that allocable solely to the transfer of the computer hardware, was subject to the tax.

Of course, whether services are subject to the use tax is a matter of law, governed by rules applicable to the construction of statutes, rather than by concessions made by the litigants. In this regard, it is patent that the legislature intended to subject services to the imposition of use taxes because, in unmistakable language, it so provided in the statute. Construed in the context of the use tax subtitle, and read in relation to the complementary sales tax subtitle, the use tax statute provides a sufficiently certain meaning of taxable services. Evidence of a broad legislative intent to tax services is found in the key statutory terms in § 372. The terms in this section — vendor, purchaser, purchase and price — are all defined in terms of assessing a use tax on services. The term "certain services" is limited only to the extent of the applicability of the exclusion of specified services in § 372 (g) (1) and (2). The sales tax subtitle similarly provides a broad concept of what constitutes a taxable service, §§ 324 (d), (f), 325, and is limited only to the extent of express exclusions. *See* §§ 324 (i) (1) and (2), 326. The services within the scope of § 373 may be determined with reasonable certainty when read in the context of the use tax subtitle, with attention focused on the key definitions of § 372, and when § 373 is viewed in relation to the sales tax subtitle.

Whether the services are taxable or not under the statute, or whether the dominant purpose of the transaction between Quotron and its subscribers was to render a service, rather than to transfer or lease tangible personal property, is not, however, determinative of whether a use tax may properly be levied upon the monthly charge or any part thereof. Although the Comptroller's position is that the purchase of a service by itself is not taxable, he claims that under the definition of "price" in § 372 (g) a service which must be contemporaneously acquired and paid for in the consummation of a transfer of tangible personal property is subject to the tax. At oral argument, the Comptroller made it plain that he seeks to impose a use tax only on that part of the monthly charge attributable to the transfer of possession of the basic hardware items and, in addition, to that part of the monthly charge allocable to information services provided to the subscriber, and for which it must pay, before Quotron will install the computer hardware on the subscriber's premises. According to the Comptroller, the minimum "package" which the subscriber must agree to accept before the computer equipment can be obtained includes the basic hardware items *and* a specified number of information services at a fixed price. The acquisition of optional information services by the subscriber, included as a part of the monthly charge, is apparently not considered by the Comptroller to be subject to the tax because these services need not be purchased in order to obtain the computer hardware; hence, they are not tied to the equipment and do not constitute any part of the ."price" paid for the purchase. However, the Comptroller maintains that hardware items transferred to the subscriber in addition to those included as a part of the uniform basic service charge, and included within the monthly charge, are properly subject to the tax.

Without regard to whether a service may be subject to a use tax, nothing in *Comptroller v. C & P Tel., supra,* undermines the position taken by the Comptroller. The issue in *C & P* was whether a transaction fell within an exemption under the Retail Sales Act for communications services.

There, the telephone company furnished both teletypewriter equipment and services to its subscribers. The Court applied a "dominant purpose" test to determine whether the monthly charge collected by C & P constituted a fee for rental of equipment or whether the charge was for services. Although the dominant purpose test was there properly utilized to effectuate the legislative intent — the issue being whether a transaction as a whole was intended to be exempt from the sales tax — that test is irrelevant where, as here, the transaction does not fall within such an express statutory exemption. On the contrary, the clear language of § 372 (g) should be given effect, and the use tax imposed on the basis of the "price" paid for the equipment, together with the information services which must be acquired as a condition to obtaining the equipment.[2]

That the transfer of possession of tangible personal property is a taxable event under § 372 (f) is entirely clear. Notwithstanding the degree of control which Quotron exercises over the computer hardware, there is no merit in the argument that possession of the property was never transferred to Quotron's subscribers. Indeed, the hardware is placed on the subscriber's premises in locations which it designates. The subscriber is contractually responsible for safekeeping the equipment that is located within its office. Access to the information stored in the computer banks may

---

**2.** Quotron argues that the information service it provides to its subscribers is within the telecommunications exemption of Art. 81, § 326 (bb), as made applicable to the use tax subtitle through § 375 (b). The exemption provides:

"*Telephone, telegraph, etc., messages or service.* — The sale of or charges for telephone, telegraph, or other telecommunication messages or service; provided that this exemption shall automatically terminate, without further action by the General Assembly, and such sales or charges shall become taxable under this subtitle, to be collected upon original statements and billings made on or after the effective date of federal legislation reducing or eliminating the rate of federal excise tax upon such sales or charges, to one percent or less."

Contrary to Quotron's position, this section is applicable only if the transaction at issue is, or was at one time, subject to the federal excise tax. The record makes no mention of whether Quotron's monthly charge is subject to federal excise tax, and therefore in the absence of proof to the contrary, it appears that Quotron is not subject to the federal excise tax, and therefore the exemption is inapplicable.

be obtained at the subscriber's discretion through operation of the keyboard. The fact that the computer hardware was under the direction of subscribers is not diminished by the fact that Quotron also maintained a measure of control over the equipment. That two parties exercise varying degrees of control over the hardware does not mean that the party with less control has no control or direction over the equipment. Section 372 recognizes that one party may have direction over the property even though another party retains an ownership interest in it. This is reflected in the provisions of § 372 (f) which recognize that title need not pass in order to constitute a taxable transfer of possession of tangible personal property.

I thus conclude, consistent with the position of the Tax Court and the Baltimore City Court, that the transfer of possession of the equipment to Quotron's subscribers was an event subject to imposition of the use tax. At the least, the tax should be calculated on the amount of the monthly charge which represents the price paid for the "purchase" of the hardware that was conditionally transferred to Quotron's subscribers for the length of the contract. Additionally, I would impose the tax on the price paid for those information services inextricably related to the transfer of the equipment, without payment for which the equipment itself could not be acquired, and also upon hardware items additional to those minimally required under the agreement.

This use tax liability is different from and in addition to the use tax already paid by Quotron with respect to its own use of the computer hardware brought into the State. Both Quotron and its subscribers use the equipment, and both uses are separate and distinct taxable privileges. Quotron's use tax liability is controlled by the same principle found in decisions imposing a sales tax upon both the purchase of cars by a rental car business and on consumers who rent the cars. *See Herbertson v. Cruse,* 115 Colo. 274, 170 P.2d 531 (1946); *Ryder Truck Rental, Inc. v. Bryant,* 170 So. 2d 822, 825 (Fla. 1964). Thus, Quotron is liable under the Maryland use tax on two grounds. It must pay a use tax on the value of the

hardware that it brought into Maryland and, pursuant to § 380, it is liable to pay, on account of its subscribers, a use tax on that part of the monthly charge which the Comptroller contends was properly subject to the tax.